Kimbra LUNCEFORD and Christopher
Lunceford, Respondents,

v.

Michael C. HOUGHTLIN and Glynn
Graybill, Appellants.

No. WD 71544.

Missouri Court of Appeals,
Western District.

Sept. 14, 2010.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 2, 2010.

Application for Transfer Denied
Dec. 21, 2010.

Jane A. Landrum, Kansas City, MO and R. Scott Smith and Christopher A. Brackman, Independence, MO, for appellants.

Paul L. Redfearn III, Kansas City, MO and Richard W. Sullivan, Independence, MO, for respondents.

Before Division One: JAMES M. SMART, JR., Presiding Judge, MARK PFEIFFER, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

This interlocutory appeal arises out of a personal injury lawsuit. The lawsuit was filed by Christopher Lunceford ("Christopher") and Kimbra Lunceford ("Kimbra") (collectively the "Luncefords") against Michael Houghtlin ("Houghtlin") and Glynn Graybill ("Graybill") following a motorcycle accident. In disposing of the Luncefords' reformation claim, the trial court found that a general release ("Release") entered into between the Luncefords and Christopher's insurance company, GuideOne Specialty Mutual Insurance Company ("GuideOne"), had been reformed by the parties to the Release, and that the reformed Release did not bar the Luncefords' personal injury claims against Houghtlin and Graybill. Houghtlin and Graybill contend that the trial court erred in finding a mutual mistake in the Release and in ordering reformation of the Release. We affirm.

## Facts and Procedural History

On May 5, 2002 the Luncefords were riding together on a motorcycle as part of a charity ride.[1] Christopher was operating the motorcycle and Kimbra was riding behind him as a passenger. Houghtlin and Graybill were operating separate motorcycles and were riding ahead of the Luncefords.

Houghtlin lost control of his motorcycle navigating a curve. He collided with Graybill. Christopher steered to the right side of the road in an attempt to avoid the accident. Unfortunately, Christopher's rear tire lost traction with the road. The Luncefords crashed into a ditch alongside the road.

Christopher sustained minor injuries in the crash. Kimbra suffered more severe injuries, including broken bones in her right shoulder and left ankle. Kimbra has sustained significant medical expenses and lost earnings.

A demand was made on Christopher's insurance carrier, GuideOne. GuideOne settled with the Luncefords for the policy limits of $50,000. As part of that settle-

---

1. The factual background is drawn primarily from the factual discussion in this court's opinion in *Lunceford v. Houghtlin,* 170 S.W.3d 453, 457–58 (Mo.App. W.D.2005).

ment, the Luncefords executed a document entitled "General Release" on December 15, 2002 ("Release"). The Release included the following language:

> Each of the undersigned, CHRISTO-PHER AND KIMBA [sic] LUNCE-FORD, BOTH INDIVIDUALLY AND AS HUSBAND AND WIFE (ONLY) for the sole consideration of FIFTY THOUSAND DOLLARS & 00/100 Dollars ($50,000) paid to one or more of them, the receipt of which is acknowledged, does release and forever discharge CHRISTOPHER LUNCE-FORD AND AMERICAN MODERN/GUIDEONE INSURANCE,[2] his, her, their or its agents and servants *and all other persons, firms, associations, and corporations* of and from any all actions, claims and demands including claims of actions for contribution and/or indemnity of whatever nature existing or which may hereafter arise out of the accident, casualty or occurrence which happened on or about the 5th day of May, 2002, at or near E HWY PLATT [sic] COUNTY including any consequences thereof now existing or which may develop, whether or not such consequences are known or anticipated.

(Emphasis added.)

The Luncefords filed suit against Houghtlin and Graybill in January of 2003. The Release was provided to Houghtlin and Graybill during discovery. Houghtlin and Graybill then amended their respective answers to assert the affirmative defense of release. They also moved for summary judgment, contending that the

Release operated as a bar to the Luncefords' claims against them.

In their reply, the Luncefords argued that neither they nor GuideOne intended the Release to operate as a bar to recovery from anyone not expressly a party to the settlement and that the Release mistakenly and incorrectly memorialized the settling parties' intent. In support of this contention, the Luncefords provided their own affidavits and an affidavit secured from a representative of GuideOne. The Luncefords and GuideOne also executed a "corrected release" ("Corrected Release") on November 5, 2003, and an "amended corrected release" on January 2004 ("Amended Corrected Release"). Both of these corrective documents deleted the phrase "and all other persons, firms, associations and corporations" from the description of the released parties. Both of these corrective documents expressly indicated an intent that the document serve as a limited partial release with a reservation of rights to pursue claims against others not expressly released. Both of the corrective documents indicated they were being made to "correct the mistakes of the original release executed December 15, 2002 to conform to the intent of the parties." The only material difference between the Corrected Release and the Amended Corrected Release was that the Amended Corrected Release named only Kimbra as a releasing party and not Kimbra and Christopher as releasing parties.[3]

The trial court granted Houghtlin's and Graybill's motion for summary judgment finding that the Release barred the Lunce-

---

2. American Modern Home Insurance acted as reinsurer on Christopher's GuideOne policy.

3. We had noted in *Lunceford* a curiosity about why the Release and the Corrected Release showed Christopher as "both a releasor and a releasee (as a tortfeasor for his wife's injuries). He would not have a loss of services claim against himself for his wife's injuries. Ordinarily, he would have no claim against his own liability carrier unless under UIM or UMI coverage.... [W]e ... observe that it is an interesting question whether the rules of general release would apply under such circumstances." 170 S.W.3d at 457 n. 1.

fords from pursuing their claims. On appeal, we reversed the trial court. *Lunceford*, 170 S.W.3d at 465. We concluded that the Release was not ambiguous and constituted a general release of all claims against all parties relating to the motorcycle accident. *Lunceford*, 170 S.W.3d at 460–61. We also concluded, however, that a release can be reformed, rejecting *Liberty v. J.A. Tobin Construction Co.*, 512 S.W.2d 886, 889–90 (Mo.App.1974), and *Rudisill v. Lewis*, 796 S.W.2d 124, 126 (Mo.App. W.D.1990), which had held that corrected or amended releases are "nullities," because a claim, once satisfied or released, can't be revived. *Lunceford*, 170 S.W.3d at 461–64.

We observed that the Luncefords and GuideOne had entered into the Corrected Release and had signed affidavits indicating that the Release mistakenly memorialized the settling parties' intent and that the Corrected Release accurately reflected their intent. *Id.* at 465. We further observed that such assertions, if proven at trial, "would form a valid basis upon which the trial court could deem" the Release reformed, such that the reformed Release "would leave reserved claims against Houghtlin and Graybill." *Id.* We held that the Luncefords had sufficiently asserted reformation of the Release as to create a genuine issue of material fact preventing the trial court's entry of summary judgment in favor of Houghtlin and Graybill on

the Luncefords' personal injury claims. *Id.* We remanded the case to the trial court for further proceedings consistent with our opinion. *Id.*

■ On remand, the Luncefords amended their petition to expressly assert a claim that the Release had been reformed by the execution of the Corrected Release and the Amended Corrected Release with GuideOne. The Luncefords asserted the reformation claim against Houghtlin and Graybill but did not name GuideOne as an additional party.[4] Houghtlin and Graybill filed another motion for summary judgment against the Luncefords based on the defense of the Release.

The trial court bifurcated the claim of reformation from the Luncefords' personal injury claims and conducted a trial in equity on the Luncefords' reformation claim pursuant to the stipulation and agreement of the parties. The trial court also indicated it was taking up Houghtlin's and Graybill's motion for summary judgment at the same time. The trial court entered its findings of fact, conclusions of law and judgment on July 29, 2009 ("Judgment"). The Judgment ordered that (1) the Corrected Release and the Amended Corrected Release correctly articulated the intent of the Luncefords and GuideOne in reaching a settlement agreement on December 15, 2002; (2) the Release is reformed in accordance with the Corrected Release and the Amended Corrected Release; and

---

4. Though GuideOne could have been a party to the Luncefords' claim, we see no reason why it needed to be a party under the circumstances in this case. GuideOne certainly cooperated in the Luncefords' presentation of evidence on their claim-and affirmatively echoed the Luncefords' contention that the Release was a mutual mistake that had already been corrected by the settling parties' agreement to correctly reflect their intent as of December 2002. In fact, it was not even necessary for the Luncefords to file a cause of action seeking a declaration that reformation

had occurred. "[W]here the parties to a contract, through their words and conduct, demonstrate an intent to reform the contract, a court can deem the contract reformed, even in the absence of pleadings seeking reformation." *Lunceford*, 170 S.W.3d at 465; *see Bullock Co. v. Allen*, 493 S.W.2d 5, 7 (Mo. App.1973). The Luncefords could thus just as easily have presented their evidence that the settling parties had already reformed the Release as a part of their defense of the Appellants' affirmative defense of release.

(3) the Luncefords' personal injury claims could proceed against Houghtlin and Graybill. Houghtlin and Graybill appeal.

## Jurisdiction to Hear Appeal

 Though neither party has raised the issue of our jurisdiction to entertain this appeal, it is our duty to determine if a final appealable judgment has been rendered before we will consider the merits of this case. *Shell v. Shell*, 605 S.W.2d 185, 190 (Mo.App. W.D.1980). The trial court in its judgment concluded that there is "no just reason for delay with respect to appealing the decision" to reform the Release and certified the judgment pursuant to Rule 74.01(b). However, "[w]hether a judgment is final and appealable is not determined by the name applied but by what is actually done according to the content, substance, and effect of the order entered." *Id.* at 189. "For certification pursuant to Rule 74.01(b), a trial court's decision must dispose of one claim." *Robinson v. Title Lenders, Inc.*, 303 S.W.3d 638, 642 (Mo.App. E.D.2010). Because the Judgment disposed of one complete claim, the Luncefords' claim for reformation, we are permitted to entertain this interlocutory appeal.

## Standard of Review

 An action for the reformation of a written contract is an equity action. *Lunceford*, 170 S.W.3d at 464. As such, it is an action tried by the court. *State ex rel. Leonardi v. Sherry*, 137 S.W.3d 462, 465 (Mo. banc 2004). We will affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or the trial court erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "When determining the sufficiency of the evidence, an appellate court will accept as true the evidence and inferences from the evidence that are favorable to the trial court's decree and disregard all contrary evidence." *Watson v. Mense*, 298 S.W.3d 521, 526, (Mo. banc 2009). Where, as here, "a contract is sought to be reformed on the ground of mutual mistake, such a mistake must appear by clear and convincing evidence." *State Farm Mut. Auto. Ins. v. McGuire*, 905 S.W.2d 150, 154 (Mo.App. W.D.1995).

## Analysis

Houghtlin and Graybill (hereinafter collectively "Appellants") assert seven points on appeal. Each of Appellants' seven points begins with the assertion that the trial court erred in finding a mutual mistake between the parties to the Release and in entering a judgment reforming the Release. Given the numerous subparts within many of their points, Appellants appear to present at least sixteen issues for review, which we have endeavored to discern, summarize, and address accordingly.

In Point One, Appellants claim: (a) the trial court omitted the terms "prior," "original," and "parties" in paragraph 71 of its Conclusions of Law; (b) there was no evidence to support that GuideOne and the Luncefords came to a prior agreement in December 2002 not accurately recited or preserved in the Release; (c) the trial court misstated the "law of the case" in paragraph 72 of its Conclusions of Law; and (d) there is no clear, cogent, and convincing evidence of GuideOne's prior intent to support the Judgment because the trial court (i) misquoted Exhibit 9; (ii) improperly introduced hearsay evidence; and (iii) erroneously relied on hindsight evidence.

In Point Two, Appellants claim the Judgment violates Rules 78.07(c) and 74.04(d) because the trial court erroneously held a hearing on their motion for sum-

mary judgment at the same time it tried the claim of reformation.

In Point Three, Appellants claim the trial court improperly made liability findings in its trial of an equity claim.

In Point Four, Appellants claim the trial court improperly relied on lay witness testimony to show GuideOne's intent when (a) the lay witnesses were not the drafters of the Release; (b) the lay witnesses were not designated as corporate representatives; (c) the lay witnesses had no personal knowledge of the Release negotiations; (d) the lay witnesses had insufficient knowledge of general practices to prove corporate intent; and (e) the lay witnesses' testimony was equivocal.

In Point Five, Appellants claim the trial court abused its discretion in denying letters rogatory to permit a second deposition of a witness to explore the assertion of the attorney-client privilege during the witness's first deposition where the trial court later permitted portions of the witness's deposition testimony to be read into evidence at trial.

In Point Six, Appellants claim the trial court erroneously applied an improper standard of proof of "more likely true than not" instead of "clear, cogent, and convincing evidence."

In Point Seven, Appellants claim the trial court erroneously determined that because they were incidental beneficiaries who did not show they detrimentally relied on the Release and provided no consideration for it, they lacked standing to challenge reformation of the Release.

Appellants' points are anything but models of clarity and present free-flowing and disjointed contentions that fall far short of the requirement that each point shall "state concisely the legal reasons for the appellant's claim of reversible error" and shall "explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error." Rule 84.04(d)(1)(B) and (C). The points include numerous abstract statements of law which are not sufficient standing alone to comply with Rule 84.04. Rule 84.04(d)(4).

■ The purpose of the briefing requirements set forth in Rule 84.04 is to give " 'notice to the party opponent of the precise matters which must be contended with and answered' and 'to inform the court of the issues presented for resolution.' " *Stickley v. Auto Credit, Inc.*, 53 S.W.3d 560, 562 (Mo.App. W.D.2001) (*quoting Thummel v. King*, 570 S.W.2d 679, 685–86 (Mo. banc 1978)). Failure to conform the points relied on to Rule 84.04(d) is grounds for dismissal. *McKee v. Wilmarth*, 771 S.W.2d 955, 957 (Mo.App. W.D. 1989). Though this court would be well within in rights to dismiss this appeal due to Appellants' material noncompliance with Rule 84.04(d), we have exercised our discretion to address the merits of this appeal having labored to discern, as best we can, the arguments actually being advanced by the Appellants.

### Point One

In their first point on appeal, Appellants contend that the trial court erred in finding a mutual mistake between the original parties to the Release and in entering a judgment which reformed the Release based on a long and varied list of claimed legal and factual errors, each going to the sufficiency of the evidence supporting the Judgment or to the propriety of the law applied by the trial court in entering the Judgment. We will address each of the claims raised within point one separately. *Claim that trial court erroneously declared or applied the law regarding proof of a prior agreement*

The Appellants contend that the trial court erroneously declared or applied the

law, calling into question paragraph 71 of the Judgment which states:

> 71. In seeking reformation it must be established that a mistake occurred that caused the contract language to differ from what the parties intended in their agreement.

The Appellants argue that this statement of the law, which is drawn directly from *Lunceford,* is inaccurate because it is incomplete. In *Lunceford,* we said:

> In *seeking reformation, it must be established that a mistake occurred that caused the contract language to differ from what the parties intended in their agreement.* [RESTATEMENT (SECOND) OF CONTRACTS Section 155 (1981).] While reformation is an "extraordinary equitable remedy," it is nevertheless available upon a showing that, due to either fraud or mutual mistake, "the writing fails to accurately set forth the terms of the actual agreement or fails to incorporate the true prior intention of the parties." *Elton v. Davis,* 123 S.W.3d 205, 212 (Mo.App. W.D.2003).

*Lunceford,* 170 S.W.3d at 464 (emphasis added). The Appellants contend that the first and second sentence in the above passage combine to provide a complete statement of the law, such that the trial court's exclusion of the second sentence in paragraph 71 of the Judgment results in an erroneous statement of the law. We disagree.

The first and second sentences in the passage from *Lunceford* complement one another. They are not expressed as distinct and independent elements of a reformation claim. In fact, the first sentence is, as noted, drawn from the RESTATEMENT (SECOND) OF CONTRACTS Section 155 (1981), which states that a court may employ reformation as a remedy when "a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing." The discussion of "true prior intentions of the parties" in *Elton* does not change this stated principle. There is simply no qualitative or legally significant difference between saying on the one hand that an agreement differs from what the parties intended or saying on the other hand that an agreement fails to incorporate the terms of the actual agreement or to incorporate the true prior intentions of the parties.

Appellants apparently disagree, and contend that since *Lunceford* relied on *Elton,* it is *essential* in describing what must be found to support reformation to expressly state the need to find a "prior agreement." Appellants' advance this strained argument as the springboard for their contention that the Luncefords could only establish a right to reform the Release with proof that GuideOne and the Luncefords *expressly* discussed the form of release they would use to document their settlement and then failed to use a form of release that included that express agreement.

▨ The Appellants have materially mischaracterized the law.

> [I]t is not necessary to show what particular words were agreed upon by the parties as words to be inserted in the instrument. It is sufficient that the parties agreed to accomplish a particular object by the instrument to be executed, and that the instrument as executed is insufficient to effectuate their intention.

*King v. Riley,* 498 S.W.2d 564, 566 (Mo. 1973) (*quoting Snider v. Miller,* 352 S.W.2d 161, 165 (Mo.App.1961)). *See also Everhart v. Westmoreland,* 898 S.W.2d 634, 637 (Mo.App. W.D.1995) (A party "need not show agreement on any particular words or language but must only show

agreement to accomplish a particular object[ive]."). Thus, a trial court weighing reformation of an instrument must consider many things, including the "wording of the contract as signed by the parties, the relationship of the parties, the subject matter of the contract, ... the circumstances surrounding the execution of the contract, and its interpretation by the parties." *Id.* at 638. Contrary to Appellants' contention that the exact language previously agreed to by the parties must be shown, "[r]eformation *may be established by circumstantial evidence* provided that the natural and reasonable inferences drawn from it clearly and decidedly prove the alleged mistake." *Id.* (emphasis added).

It is true that proof of a mutual mistake necessary to establish the right to reform an agreement "must be clear, cogent, and convincing and upon *testimony* entirely exact and satisfactory." *Morris v. Brown,* 941 S.W.2d 835, 840 (Mo.App. W.D.1997) (emphasis added). However, there is no authority for the proposition that the exact terms of a prior agreement must be shown. It is enough to show that both parties, at the time of the contract, shared a misconception about a basic assumption upon which they based their bargain. *Alea London Ltd. v. Bono–Soltysiak Enters.,* 186 S.W.3d 403, 415 (Mo.App. E.D.2006). Here, therefore, it is enough if the Luncefords have shown a misconception shared by them and GuideOne that the Release would not bar the Luncefords from pursuing their claims against the Appellants.

The trial court's statement of the law in paragraph 71 of the Judgment is not erroneous.

***Claim that there was no clear, cogent, and convincing evidence of a prior agreement***

Appellants contend there was insufficient evidence of a prior agreement between the Luncefords and GuideOne that had not been accurately recited or preserved in the Release. Appellants spend considerable time addressing the evidence they believe would have supported a decision not to award reformation. Appellants ignore, however, that our standard of review does not permit us to reweigh the evidence. Rather, we accept as true the evidence and inferences drawn from the evidence that are favorable to the trial court's decree and disregard all contrary evidence. *Watson,* 298 S.W.3d at 526. In the process, we generally defer to the trial court's findings of fact. *Reinbott v. Tidwell,* 191 S.W.3d 102, 107 (Mo.App. S.D. 2006). Employing this standard of review, there was substantial evidence from which the trial court could conclude that the Luncefords established by clear, cogent, and convincing evidence that neither GuideOne nor the Luncefords intended the Release to have the effect of barring claims against the Appellants.

The Luncefords' counsel advised GuideOne's agent, Kevin Davis, that the Luncefords wanted to resolve the claim against Christopher's policy quickly so that the Luncefords could pursue claims against the Appellants. Demand had already been made by the Luncefords on the Appellants' respective insurance carriers at the time of the settlement negotiations with GuideOne. The Luncefords demanded that GuideOne pay out its policy limits because Kimbra's medical bills alone already exceeded those policy limits by a large margin. The Luncefords never offered to release the Appellants in exchange for GuideOne paying out its policy limits, and GuideOne never demanded a release of the Appellants (or anyone other than itself and its insured) as a condition of paying out its policy limits. Upon learning that the Appellants intended to

assert the Release as a bar to the Luncefords' claims against them, the Luncefords' counsel called Kevin Davis. Kevin Davis told the Luncefords' counsel that GuideOne had not intended to cut off the Luncefords' claims against the Appellants. The Luncefords' counsel and Kevin Davis then discussed a mechanism for correcting the Release. As a result, a Corrected Release was prepared and sent by the Luncefords' counsel to Kevin Davis's attention.

The Corrected Release expressed that the Release was erroneous and did not conform to the intent of the parties to the extent construed to release claims against the Appellants. Kevin Davis received authority from his supervisors to execute the Corrected Release. However, Kevin Davis left the employ of GuideOne before the Corrected Release was executed. Kurt Groetsch, another GuideOne employee, took over the Luncefords' file. Though Mr. Groetsch had not handled the negotiation of the Release and did not talk with Mr. Davis, he did review the Luncefords' file and concurred that there was no indication in the file that GuideOne had ever intended to require the Luncefords' to release claims against all persons as a condition of being paid the policy limits on the GuideOne policy. The only memorandum in the file discussing GuideOne's requirement at the time of execution of the Release was a memorandum authorizing Mr. Davis to settle with the Luncefords for the policy limits, which memorandum expressed the need to name both of the Luncefords but was silent about the need to name anyone else. Mr. Groetsch and GuideOne's in-house counsel, Nancy Gill, testified that this was consistent with GuideOne policies and practices requiring only that the rights and interests of the company and its specific insured be protected by release documents. Mr. Groetsch executed an affidavit confirming that the parties

to the Release had always understood that Kimbra intended to pursue claims against the Appellants. Mr. Groetsch executed the Corrected Release on GuideOne's behalf on November 5, 2003. An Amended Corrected Release and related affidavit from Mr. Groetsch were later signed to further correct the parties' mistake in suggesting in the Release that Christopher was both a releasing party and a party being released. Both the Corrected Release and the Amended Corrected Release included an express statement by the Luncefords and GuideOne that the corrective documents were being executed to "correct the mistakes of the original release executed December 15, 2002 to conform to the intent of the parties." Based on this evidence, the trial court found that the original 2002 Release "was contrary to the intent of the parties to the release on December 15, 2002." Further, the trial court found that the settling parties did demonstrate by clear and convincing evidence that the Release "was the result of the mutual mistake of the parties ... and contrary to the intent of the parties executing the release at the time that the release was executed."

Factually, this case is very similar to *Everhart* and to *Hess v. Ford Motor Co.*, 27 Cal.4th 516, 117 Cal.Rptr.2d 220, 41 P.3d 46 (2002). Because the factual similarities between these cases and the case before us are strikingly relevant, we discuss both cases in detail.

In *Everhart,* a minor was injured in a one-car accident which left the minor with severe brain injuries. 898 S.W.2d at 635. The driver of the vehicle was the stepdaughter of the vehicle's owner. *Id.* at 636. The insurer of the vehicle's owner contacted the injured minor's parents and advised a willingness to settle for the policy limits of $50,000. *Id.* There was discussion, apparently, during these negotiations,

about the insurer's view that the step-daughter was solely liable for the accident. *Id.* The minor's parents agreed to settle for the policy limits. *Id.* An attorney was engaged by the insurer to document the settlement, and in doing so, utilized a general release naming the insured, the insurer, and "all other persons, firms and corporations" as released parties. *Id.* The minor's parents later learned another party, the passenger sitting next to the step-daughter, had control of the steering wheel at the time of the accident. *Id.* The minor's parents and the insurer reopened the minor settlement by agreement and modified the general release executed with respect to the minor's injuries to strike the language "all other persons, firms or corporations." *Id.*

After the minor died, the minor's parents then sued the driver of a vehicle traveling ahead of the vehicle involved in the crash for loss of consortium, claiming that driver had instructed the driver of the second vehicle to follow him. *Id.* This defendant asserted the general release as a defense. *Id.* The parents then filed a separate reformation action against the insurer. *Id.* In this action, the insurer and the parents admitted they had both been mistaken at the time of the original release about persons potentially liable for the accident. *Id.* The newly named defendant intervened and sought a declaration that the general release barred the parents' loss of consortium claims against him. *Id.*

The trial court found sufficient evidence, based on these facts, to warrant reformation. The evidence included testimony from the attorney who prepared the general release that he would not have used a general release had he known of the prospect of other non-settling tortfeasors. *Id.* at 637. The evidence also included the previously agreed correction of the general release on behalf of the injured minor with

respect to his damage claims. *Id.* at 638. The trial court found that the insurer and the parents were mutually mistaken that the driver of the vehicle involved in the accident was solely responsible and reformed the general release to permit the parents to pursue other tortfeasors for loss of consortium. *Id.* at 637. We affirmed. *Id.* at 639.

In *Hess,* Hess was a passenger in a pickup truck that rolled over, rendering him a paraplegic. *Id.* at 49. Hess made a claim against the driver's carrier. *Id.* Hess settled with the driver's carrier for the policy limits of $15,000. *Id.* Hess signed a boiler plate release provided by the carrier. *Id.* The release released the driver, the carrier, and "all other persons, firms, corporations, associations or partnerships." *Id.* Several months later, Hess filed a products liability lawsuit against Ford Motor Company. *Id.* at 49–50. Four years later, Ford discovered the release with the driver and moved for summary judgment, claiming the release absolved all tortfeasors of liability. *Id.* at 50. Shortly before summary judgment was granted, Hess filed a reformation lawsuit against the driver and his carrier claiming the general release language was a mutual mistake. *Id.* The driver and the carrier admitted the general release language was a mutual mistake. *Id.* The trial court in the reformation action reformed the general release ten days after Ford's summary judgment motion in the products liability case was entered. *Id.* Hess moved for a new trial, which was denied. *Id.* The court of appeal reversed concluding there was a triable issue of fact as to whether a mutual mistake occurred. *Id.*

At trial, Ford relied on the language of the general release and offered no other evidence. *Id.* Hess and his attorney both testified they never intended to release Ford. *Id.* In fact, the attorney had ac-

quired the pickup truck involved in the accident in preparation for litigation with Ford. *Id.* The claims adjuster involved in negotiating the settlement testified that he had discussed Hess's intention to sue Ford and that he knew Hess would not have settled had he believed he was releasing Ford. *Id.* The trial court reformed the release, and the jury awarded a sizeable verdict against Ford. *Id.* On appeal, reformation of the release was affirmed. *Id.* at 55. The court found this evidence sufficient to support the judgment of reformation: (1) Ford did not sign the release nor participate in its negotiation; (2) Hess's attorney and the adjuster openly discussed the intent to sue Ford; (3) Hess's attorney subsequently acquired the pickup truck in preparation of a suit against Ford; (4) the release form was a boiler plate form, and there had been no discussion of a need or requirement to release "all persons"; (5) the parties to the release agreed they made a mutual mistake; and (6) the small amount of the policy limits settlement in comparison to damages which greatly exceeded the settlement. *Id.* at 53–54.

▇▇▇ As noted, there are striking similarities between these cases and the Luncefords' case. One of the most compelling similarities is that, as in *Hess*, the Luncefords' told Mr. Davis that they intended to sue other tortfeasors at the time of the settlement. Equally compelling is that, as in *Hess*, the policy limits settlement was substantially less than Kimbra's known medical expenses at the time. Further, Mr. Davis acknowledged the mistake and took action to work with the Luncefords to correct the mistake. Finally, all of these cases involved an agreement among the parties that a mutual mistake had been made such that the general release did not reflect the parties' intent as of the time of its making. As we noted in *Everhart,* though "the party seeking refor-

mation bears the burden of proof by clear, cogent, and convincing evidence. Nevertheless, reformation is proper when all parties seek it or the defendant admits the mistake." 898 S.W.2d at 637 (citation omitted). "The defendant's admission of mistake establishes that the plaintiff's version of the contract is the one intended by the parties." *Id.*

▇▇▇ Appellants improvidently focus on only that evidence of a prior agreement pre-dating the execution of the Release and claim that evidence of events or conduct after the Release was signed is incompetent "hindsight" evidence. The non-settling tortfeasor unsuccessfully raised a nearly identical argument in *Everhart,* claiming that the trial court erroneously considered the acts of the settling parties in correcting a general release as evidence of a "prior agreement." 898 S.W.2d at 637. We found that the trial court appropriately considered the proposed agreement of the settling parties to correct the release in connection with other evidence of reformation. *Id.* at 638. Thus, there is simply no support for Appellants' proposition that the evidence relevant to establishing a mutual mistake must be constrained to evidence pre-dating the agreement a party seeks to reform. Statements and conduct of the parties that occur after the making of the written instrument may be admissible to establish the facts concerning the issue of a mutual mistake. *Sperrer v. Sperrer,* 573 S.W.2d 693, 695 (Mo.App.1978).

We conclude that the trial court's judgment was supported by substantial evidence establishing clear, cogent, and convincing proof that the Release failed to accurately reflect the parties' prior agreement. It is sufficient to support reformation to show that the parties agreed to accomplish a particular goal and that the instrument as executed is insufficient to

effectuate their intentions. *Id.* The Release had an effect that was not intended by the parties, and was eligible, therefore, for reformation.

**Claim that the trial court erroneously declared or applied the law regarding proof of prior/original intent of both parties**

The Appellants next complain that the trial court misstated the law in paragraph 72 of the Judgment when it held:

72. Reformation is an equitable remedy that is available upon a showing that, due to mutual mistake, the writing fails to incorporate the true intentions of the parties. *Lunceford,* 170 S.W.3d at 464.

Once again, Appellants make the argument that *Lunceford* necessitates inclusion of the word "prior" in any statement of the law regarding that which must be establish to warrant reformation. By not including the word "prior" between the words "true" and "intentions," Appellants contend the trial court erroneously declared the law. We disagree. As previously discussed, the word "prior" is not essential to an accurate description of the standard for determining a mutual mistake. There are many ways to express the principle that reformation requires proof that an agreement fails to reflect the parties' intentions at the time it was made.

Even if the Appellants' contention had merit, which it does not, we believe it is evident that the trial court's reference to the "true intentions" of the parties in paragraph 72 of the Judgment is meant to refer to the parties' intentions as of the time of entering into the Release.

**Claim that there is no clear, cogent, and convincing evidence of GuideOne's prior intent**

This claim initially appears to restate Appellants' previous claim that there was not clear, cogent, and convincing evidence of a prior agreement. In discussing the particulars of this claim in their brief, however, Appellants raise new concerns: (1) the trial court misquoted an exhibit; (2) the trial court relied on improper hearsay; and (3) the trial court relied on incompetent hindsight evidence.

 With respect to the first complaint, Appellants claim the trial court misquoted Exhibit 9 when it found in paragraph 20 of the Judgment as follows:

20. On December 5, 2002, Guide One Insurance Company authorized Mr. Kevin Davis to conclude a settlement of the claim by Kimbra Lunceford against her husband Christopher Lunceford for the policy limits requesting only that Lunceford and Mrs. Lunceford be named on the release. (Exhibit 9).

Exhibit 9 is an insurance memorandum which states: "Tom/Kevin, proceed to conclude as requested in exchange for release. Both Mr. and Mrs. Insured should be named on release as well as payment."

The Appellants object to the trial court's finding. They construe the finding as an affirmative determination by the trial court that GuideOne requested that *only* the Luncefords appear on the release to the exclusion of the release terms being general in scope. A fair interpretation of the memorandum could warrant such a finding. However, it is apparent the trial court did not make such a specific finding. The trial court only stated what is obvious and uncontested from the face of the memorandum. The trial court found that the *only* names GuideOne expressly required be identified in the Release were the Luncefords. Whether this proves the affirmative (that GuideOne was expressly directing that non-settling tortfeasors *not* be released) or the negative (that GuideOne was simply requiring reference to the Luncefords without commenting on whether the Release should cover non-settling

tortfeasors) is of no import. In either case, the memorandum is compelling evidence that GuideOne did not instruct Mr. Davis that he needed to secure a general release releasing non-settling tortfeasors as a condition of paying the policy limits to the Luncefords.[5]

With respect to the second issue, Appellants complain that the trial court erroneously permitted hearsay testimony over the Appellants' objection. The Luncefords' counsel[6] was permitted to testify about the conversation he had with Kevin Davis[7] after learning that the Appellants intended to assert the Release as a bar to the Luncefords' claims. The trial court allowed counsel to testify that when he explained the issue about the Release to Mr. Davis, Mr. Davis told him "that was not what we meant to do, being from his end, that was not what we meant to do." It appears the trial court treated this testimony as falling within the "state of mind" exception to the hearsay rule, as the trial court overruled the Appellants' hearsay objection after the Luncefords' trial counsel argued the applicability of this exception.

The state of mind exception to the hearsay rule permits admission of a contemporaneous statement relating to a person's *existing* intent to prove the person actually had such intent, if the intent is a relevant issue in the case. *Coon v. Am. Compressed Steel, Inc.*, 207 S.W.3d 629,

635 (Mo.App. W.D.2006). Appellants argue on appeal that Mr. Davis's statement does not qualify for the state of mind exception because the only relevance to the statement was the extent to which it reflected on Mr. Davis's (and thus GuideOne's) intent at the time of the Release. We disagree.

Mr. Davis's *present* intent was relevant in this case. As previously noted, the statements and conduct of parties *after* the making of an allegedly mistaken agreement are admissible to demonstrate a mutual mistake. *Sperrer*, 573 S.W.2d at 695. Mr. Davis responded to the news that the Release was being employed to bar the Luncefords' claims against the Appellants in a manner consistent with Mr. Davis's *present* belief that the Release was not meant to have had such an effect. Mr. Davis's *present* belief combines with other evidence, including evidence that Mr. Davis knew at the time of settlement that the Luncefords intended to sue the Appellants, to permit the conclusion that the parties' never intended the Release to have the effect of foreclosing the Luncefords' ability to sue the Appellants.

Even if the trial court erroneously admitted this testimony, however, in a court tried case, "[i]t is practically impossible to predicate reversible error on the erroneous admission of evidence. The party advancing that contention must demonstrate the absence of sufficient compe-

---

5. This memorandum is, notably, consistent with the testimony of Mr. Groetsch and Ms. Gill who testified that the policies and practices of GuideOne centered around protecting the interests of the company and its insureds and not on securing releases for the benefit of non-settling tortfeasors.

6. When we refer to the Luncefords' counsel in this opinion, we are referring to the attorney who handled the settlement with GuideOne. That attorney remains as counsel for the

Luncefords in the suit against the Appellants. However, additional trial counsel was retained to try the reformation action and to principally handle this appeal. We refer to the attorney who tried the reformation action as the Luncefords' trial counsel.

7. Mr. Davis was no longer employed by GuideOne and could not be located. He was not available to testify at trial or to provide a pretrial deposition.

tent evidence to support the trial court's decree." *Gould v. Starr*, 558 S.W.2d 755, 769 (Mo.App.1977). Appellants fail to argue, and would in any event be unable to demonstrate, that there was no substantial evidence, even without Mr. Davis's statement to the Luncefords' counsel, to support the Judgment.

Next, the Appellants complain that the trial court erroneously relied on hindsight evidence. This is a replay of the same argument heretofore made and rejected that the only evidence relevant to determining whether an agreement fails to incorporate the parties' intentions is evidence from the period *predating* the agreement. For the reasons previously expressed, this argument is without merit.

Point one is denied.

### Point Two

██ In their second point, Appellants claim the trial court violated Rule 78.07(c) and Rule 74.04(d) by failing to specify facts without substantial controversy in a separate summary judgment order and erroneously held a trial on the claim of reformation along with conducting a hearing on the Appellants' motion for summary judgment. This claim is without merit.

The trial transcript and other portions of the record clearly reflect that the trial court, with the parties' consent, conducted a trial on the Luncefords' claim of reformation at the same time it took up the Appellants' related summary judgment motion. On April 9, 2009, the trial court issued a "Notice of Reformation Hearing" for June 2, 2009. Prior to the hearing date, the parties submitted deposition designations (and their objections and counter designations to same) "to be presented in the trial of this action." When the parties appeared for hearing on June 2, 2009, the trial court stated:

Let the record reflect, first of all, counsel, that this matter comes to the Court today upon the Court's setting of a hearing regarding an issue of reformation that we have in this case. The record should reflect that there were some summary judgments filed, but based on, obviously, the issues that were tied—the issues that were involved in the summary judgment were so tied to the reformation that the Court obviously felt that it would be better to take that summary judgment with the evidence that is going to be presented in the reformation hearing, and then, obviously, make its judgment regarding those two issues combined.

The parties then discussed procedural matters, characterizing the hearing as a "trial to the court." The trial court later stated:

My plan was to go forward with the reformation. And the reason for that is that I think if we go forward with the reformation, then obviously that information that I felt was kind of lacking from the summary judgment would be kind of filled in the blanks, so to speak, for me. . . . My plan was to go forward with the reformation and just take the summary judgment with the reformation case.

Appellants registered no objection to proceeding in this fashion. They cite *In re Estate of Pittsenbarger*, 136 S.W.3d 558, 564 (Mo.App. W.D.2004), for the proposition that it is error as a matter of law for a trial court to "collapse" a hearing on a motion for summary judgment with a trial. However, *Pittsenbarger* is inapplicable to this case. In *Pittsenbarger*, a trial court overruled a motion for summary judgment, then summarily entered judgment for the non-movant on the merits, without noticing a trial. *Id.* We held that the trial court "was operating under the mistaken belief

that it could treat the summary judgment hearing as a substitute for a trial on the merits. That it could not do, *absent an agreement to that effect,* because the two are completely different." *Id.* (emphasis added).

In contrast, Appellants clearly knew that the trial court had noticed the reformation claim for trial, and Appellants submitted pleadings and engaged in preliminary procedural discussions on the record consistent with proceeding to trial. Appellants were advised on the record at trial that the trial court was "taking the summary judgment" with the reformation claim. Appellants never objected. There is no error here.

By entering Judgment finding in favor of the Luncefords on their claim for reformation, the trial court effectively mooted the Appellants' summary judgment motion. The trial court, therefore, did not "rule" in its Judgment on the summary judgment motion because it was unnecessary for it to do so.[8] As the Judgment was not a ruling on the summary judgment motion, the trial court was not obligated to comply with Rule 74.04(d). Point two is denied.

### Point Three

For its third point, Appellants complain that the trial court improvidently made findings of fact that addressed the underlying facts of the accident and the presence of personal injury, matters which Appellants contend exceeded the scope of the equity matter before the trial court, thus violating the Appellants' right to a jury trial on the issue of liability. Specifically, Appellants complain about paragraphs 4, 5, and 6 of the Judgment. In those paragraphs, the trial court found that Christopher Lunceford was driving

his motorcycle with Kimbra as a passenger and that he was following motorcycles driven by Houghtlin and Graybill; that while rounding a curve on H highway in Platte County, Christopher saw Houghtlin's motorcycle slide into Graybill's motorcycle causing a collision; and that to avoid hitting Houghtlin and Graybill, Christopher took evasive action and ran off the highway into a ditch causing injuries to himself and Kimbra.

These factual findings are virtually identical to the recitation of facts drawn from our opinion in *Lunceford,* 170 S.W.3d at 457–58. The trial court committed no error in simply repeating facts which have already been published in this court's opinion.

Moreover, we see nothing prejudicial about the facts recited by the trial court, which assess no fault or causation, but which merely report a series of background events giving rise to the Luncefords' settlement with GuideOne and subsequent suit against the Appellants. The facts appear to have been offered by the trial court as nothing more than the minimum "context" necessary to permit a reasoned analysis of the reformation claim.

Point Three is denied.

### Point Four

For its fourth point, Appellants contend the trial court improperly relied on lay witness testimony of GuideOne employees (a) who were not the drafters of the Release; (b) who were not designated as corporate representatives; (c) who had no personal knowledge of the Release negotiations; (d) who had insufficient knowledge of general practices to prove corporate intent; and (e) whose testimony was equiv-

---

8. The trial court's docket sheet does reflect an entry on November 12, 2009, indicating that the Appellants' motion for summary judgment was "no longer an issue."

ocal. The two GuideOne employees who testified were Mr. Groetsch and Mr. Gill. The testimony of both employees was entered into evidence by reading in portions of their respective depositions.

■ Appellants first object that Mr. Groetsch and Ms. Gill were not preparers or drafters of the Release. This is not contested. Appellants claim in their brief that "Missouri cases have consistently held the preparer of releases or deeds, a duly-authorized corporate representative, or the person who negotiated the terms of the contract or release must admit a mistake in order to prove mutual mistake of fact on behalf of a corporation." Appellants' Br. 42. Appellants cite *Edwards v. Zahner*, 395 S.W.2d 185, 191 (Mo.1965), and *Brinkerhoff Land & Livestock Co. v. Doyle*, 778 S.W.2d 336, 338 (Mo.App. S.D.1989), for this proposition. However, neither case stands for the proposition argued by Appellants. Rather, the cases simply provide that a court is free (though not required) to draw an unfavorable inference from the absence of testimony from the person preparing a purportedly mistaken document.

Appellants also cite *Husch & Eppenberger, LLC v. Eisenberg*, 213 S.W.3d 124, 134 (Mo.App. E.D.2006), observing only that the parties who testified about a purported mistake in a release happened to be the parties who negotiated the release. Though this is factually accurate, *Husch & Eppenberger* does not stand for the principle that the parties who negotiated a release *must* testify.

None of the cases cited by Appellants, therefore, hold that the *only* persons who can testify about the intent of the parties in entering into a mistaken document are the persons who engaged in the negotiations. In fact, in *Everhart* we held otherwise. A third party objecting to reformation of a release complained that the parties to the release had failed to "call any agent or employee of Equity Mutual who had participated in the negotiations." *Everhart*, 898 S.W.2d at 638. The third party claimed that the testimony of an attorney who prepared the release was "insufficient to establish mutual mistake because he did not participate in the actual negotiations." *Id.* We concluded that "[t]he absence of testimony from an employee or agent of Equity Mutual is inconsequential." *Id.* Instead, the court is to look at the entirety of the record to determine whether substantial evidence supports the trial court's judgment of reformation. *Id.* at 638–39. We conclude, therefore, that the trial court's Judgment is not erroneous because the trial court heard testimony from employees of GuideOne who did not actually negotiate the Release.

■ Appellants next complain that Mr. Groetsch and Ms. Gill were not designated as corporate representatives for GuideOne. Though neither witness had been noticed for their depositions as designated corporate representatives pursuant to Rule 57.03(b)(4), that does not render them "lay witnesses" incompetent to testify on behalf of or in a manner that will bind GuideOne.[9] Rule 57.03(b)(4) merely provides that a party *may* name a corporate entity as a deponent in a notice or subpoena and may designate matters about which the corporate entity is to designate a representative to speak on its behalf. This does not mean, however, that the only mechanism

---

9. In their brief, Appellants suggest that the trial court ruled that neither Mr. Groetsch nor Ms. Gill were testifying as a corporate designee of GuideOne. We see nothing in the record to support this assertion, and certainly nothing in the record to support an assertion that the trial court ever ruled (or was ever asked to rule) that the witnesses were not agents of GuideOne.

for taking testimony from an agent of a corporation is through a deposition requiring that the agent be designated as a corporate representative. Appellant cites to no such authority. In fact, the contrary is true. Corporate employees are free to testify within the scope and course of their employment concerning matters within the scope and course of their employment. *State ex rel. Pitts v. Roberts,* 857 S.W.2d 200, 202 (Mo. banc 1993); *Standard Meat Co. v. Taco Kid of Springfield, Inc.,* 554 S.W.2d 592, 595 (Mo.App.1977). Appellants have not argued that Mr. Groetsch and Ms. Gill were not agents of GuideOne or that their testimony exceeded matters within the scope and course of their employment.[10] The trial court correctly determined that it was immaterial whether Mr. Groetsch and Ms. Gill had been designated as corporate representatives during their depositions and that the deposition testimony of both witnesses was admissible.

■ Appellants next contend that Mr. Groetsch's and Ms. Gill's testimony about GuideOne "company practices" was not instructive on the issue of GuideOne's intent when it entered into the Release. However, Appellants offer no support for this proposition. The cases the Appellants rely on in their brief relate to the capacity of a witness to testify about an industry custom for purposes of establishing an industry standard of care. Mr. Groetsch and Ms. Gill did not testify about an "industry standard of care" or "industry custom." They testified about the specific policies and procedures of their employer, GuideOne, in relation to the settlement of claims. We cannot conclude that such evidence is irrelevant or that either Mr. Groetsch or Ms.

Gill was an incompetent witness to provide such testimony.

■ Appellants next complain that Mr. Groetsch and Ms. Gill had no personal knowledge of GuideOne's intent at the time of the Release. We disagree. It is true that neither witness participated in the settlement discussions with the Luncefords or in the preparation of the Release. However, both had reviewed the company's file relating to the settlement; both had familiarity with relevant company practices and procedures; and both were positioned, based upon the scope and course of their employment duties, to advise their view of the company's intent at the time of the Release. Moreover, both witnesses were involved in the preparation and/or execution of the corrective release documents. Their testimony about why the corrective release documents were entered into is highly relevant, particularly as those documents expressed that GuideOne made a mistake with respect to the effect of the Release and that the corrective release documents were made to reflect the intent of the parties as of the time of the Release. As the trial court correctly observed, the Appellants' complaints about the extent of these witnesses' "personal knowledge" of the Release, not having participated in its preparation, went to the weight to be afforded their testimony and not to its admissibility.

■ Finally, Appellants argue that Mr. Groetsch's and Ms. Gill's testimony regarding GuideOne's intent was equivocal and contradictory. To support this contention, Appellants re-argue the evidence, asking us to focus on that evidence Appellants believe would support a different out-

---

10. Appellants did raise the issue that Mr. Groetsch had never worked in GuideOne's automobile division. However, the trial court correctly noted that this was a matter to be taken into consideration in assessing the weight to be afforded Mr. Groetsch's testimony.

come. However, as we have previously noted, that is not our standard of review. We look to whether the trial court's Judgment is supported by substantial evidence, accepting as true the evidence and reasonable inferences drawn there from that are consistent with the Judgment.

Though Mr. Groetsch conceded he had no supervisory responsibility over Mr. Davis and that he had never spoken with Mr. Davis about the Lunceford file, Mr. Groetsch also testified that GuideOne's policy and procedure is to focus on protection of the interests of its insured and the company. Mr. Groetsch testified that the Release was a mistake given this policy and procedure, as GuideOne does not make it a practice to concern itself with securing releases for the benefit of non-settling tortfeasors. Mr. Groetsch testified that he was familiar with GuideOne's claims practices and that his review of the Luncefords' file indicated nothing to suggest there would have been a basis to deviate from GuideOne's standard practices. In other words, Mr. Groetsch testified that the file did not include anything to suggest GuideOne required or intended to secure a release for the benefit of anyone other than its insured and the Company.

Ms. Gill testified that the intent of GuideOne at the time of the Release was discernible not just from talking with Mr. Davis but also by looking at company policy. According to Ms. Gill, who had been GuideOne's senior corporate counsel since 2001, GuideOne had no interest in precluding claims a claimant may have against other parties. Rather, the company's policy was simply to protect the company and its insured from further liability.

In addition to this testimony, the trial court heard the testimony of the Luncefords' counsel about his express discussions with Mr. Davis, both at the time of negotiation of the Release and later, when the Release was employed by the Appellants to defend the Luncefords' claims. During negotiation of the settlement with Mr. Davis, the Luncefords' counsel advised Mr. Davis of the Luncefords' intent to pursue claims against the Appellants. Yet, Mr. Davis never advised that as a condition of paying out the policy limits on Christopher's policy, a general release of claims against all parties would be required. Moreover, Mr. Davis knew that at the time of GuideOne's settlement for the $50,000 policy limits, Kimbra already had in excess of $100,000 in medical expenses-making it implausible that Kimbra would be willing to release claims against other known tortfeasors. *Hess*, 117 Cal.Rptr.2d 220, 41 P.3d at 54.

The trial court did not improperly rely on the testimony of Mr. Groetsch or Ms. Gill. Point Four is denied.

### Point Five

For their fifth point, Appellants contend that the trial court abused its discretion in failing to issue letters rogatory to permit them an opportunity to conduct a second deposition of Ms. Gill in order to obtain her file. Access to Ms. Gill's file had, apparently, been partially denied during the first deposition based on a claim of attorney/client privilege. Bootstrapping off of its argument that Ms. Gill was but a lay witness who had not been designated as a corporate representative, Appellants claim they were entitled to retake Ms. Gill's deposition and to secure her complete file because she had no privilege to protect—i.e. her testimony could not be imputed to GuideOne, and thus her file could not be protected by the attorney/client privilege because she had not been designated as a corporate representative.

We have already discussed the fallacy underlying the Appellants' argument. A corporate employee remains an agent of the company, and may be bound by obligations owed to the company, or conversely may bind the company by testimony under appropriate circumstances, regardless whether the employee has been subpoenaed to testify or otherwise called to testify as a designated "corporate representative."

We will not reverse a trial court's decision for abuse of discretion unless the decision is " 'so arbitrary and unreasonable as to shock the sense of justice and indicates a lack of careful consideration.' " *Sunswept Props., LLC v. Ne. Pub. Sewer Dist.*, 298 S.W.3d 153, 159 (Mo.App. E.D. 2009) (quoting *Burnett v. Kansas City Sch. Bd.*, 237 S.W.3d 237, 238 (Mo.App. W.D. 2007)). The trial court did not abuse its discretion in refusing the requested letters rogatory, particularly were, as here, the rationale underlying the request for a second deposition of Ms. Gill was grounded in an erroneous belief that Ms. Gill had no right to assert an attorney/client privilege to protect her client employer merely because she had not been designated as a "corporate representative."

Point Five is denied.

## Point Six

In their sixth point, Appellants contend that the trial court employed the incorrect burden of proof for reformation. Specifically, the appellants cite to paragraph 74 of the Judgment where the trial court stated that:

74. The burden of proof for reformation is more likely true than not true when the parties to the original contract are in agreement that the contract should be reformed. *Everhart*, 898 S.W.2d at 637.

In paragraph 75 of the Judgment, however, the trial court stated that:

75. Kimbra and Christopher Lunceford have presented facts that prove by clear and convincing evidence that the December 15, 2002 release mistakenly and incorrectly memorialized the settling parties' intent at the time the December 15, 2002 release was executed by the parties.

Appellants argue that these paragraphs are contradictory and show that the trial court was confused as to the proper burden of proof in a reformation case. We disagree. The trial court clearly stated in paragraph 75 of the Judgment that the Luncefords presented evidence proving by clear and convincing evidence that the Release should be reformed. The trial court's reference to the *Everhart* case in paragraph 74 of the Judgment is not meant to impose a lesser burden of proof in a reformation action but merely to "summarize" the discussion in *Everhart* of the ability to prove reformation by clear and convincing evidence when both parties to the mistaken document concede the mistake.

In *Everhart*, we held:

Ordinarily, the party seeking reformation bears the burden of proof by clear, cogent, and convincing evidence. Nevertheless, reformation is proper when all parties seek it or the defendant admits the mistake. The defendant's admission of mistake establishes that the plaintiff's version of the contract is the one intended by the parties.

898 S.W.2d at 637 (internal citations omitted). *Everhart* did not modify the burden of proof for reformation actions. *Everhart* simply pointed out the obvious-it will be much easier to prove, if not *per se* establish, that reformation is warranted by the clear, cogent, and convincing evidence standard where the fact of a mutual mis-

take is not contested by the parties to the document sought to be reformed.

The trial court did not apply the incorrect burden of proof. Point Six is denied.

## Point Seven

In their seventh point, Appellants claim the trial court erroneously concluded that they were incidental beneficiaries to the Release who lacked standing to contest its reformation or to enforce the Release. Appellants point to the trial court's conclusion of law in paragraph 73 of the Judgment which provides:

> The Defendants in this case at best are incidental beneficiaries to the release executed on December 15, 2002, and, therefore, have questionable standing to challenge the reformation of the agreement and to enforce the December 15, 2002 release for their protection. *Lunceford,* 170 S.W.3d at 465.

For reasons we will hereinafter discuss, the trial court's suggestions that Appellants may be "incidental beneficiaries" with "questionable standing to challenge" reformation of the Release or to enforce the Release are not legally correct. However, that does not require us to reverse the Judgment. The trial court merely *questioned* Appellants' standing without ruling on the issue. Certainly, the trial court did not treat Appellants as if they lacked standing. Appellants were never barred from presenting or contesting evidence during trial because of a lack of standing. In fact, the trial court entered a multiple page Judgment which would have been completely unnecessary given Gui-

deOne's agreement that the Release was mutually mistaken had the trial court treated the Appellants as lacking standing to contest reformation of the Release.

The trial court did not conclude that the Appellants had no standing to challenge reformation of the Release or to reform the Release. By citation to *Lunceford,* the trial court was simply acknowledging, as was held in that case, that non-settling tortfeasors are "at best" third party beneficiaries to a general release. 170 S.W.3d at 465. To the extent the trial court's "questioning" goes further than *Lunceford* to erroneously question whether non-settling tortfeasors can challenge reformation of a general release and/or enforce a general release, such questioning is superfluous to the Judgment. Paragraph 73 had no effect on the ultimate conclusion reached by the trial court in this case—that the Luncefords presented clear, cogent, and convincing evidence that the Release included a mutual mistake and should be reformed in the manner indicated by the Corrected Release and the Amended Corrected Release.

We are nonetheless obliged to address the trial court's erroneous (albeit non-prejudicial) suggestion that Appellants may have lacked standing to challenge reformation of the Release or to enforce the Release. In light of *Lunceford,* it is highly probable that trial courts will be called upon in future cases to address reformation of general releases. The procedural posture for presentation of the reformation issue may vary.[11] In any procedural sce-

---

11. A reformation case may or may not involve an agreement among the parties to the general release that a mutual mistake has been made. Sometimes reformation may be sought in a separate lawsuit naming only the other party to the general release, and the non-settling tortfeasor may seek to intervene. Sometimes, reformation may be asserted as

an additional claim in a personal injury action, naming only the other party to the release (but not the non-settling tortfeasor) as a defendant, leaving the trial court to determine the extent to which the non-settling tortfeasor can participate in the reformation claim. Sometimes, as in this case, reformation will be asserted as an additional claim against the

nario, however, a trial court will be required to grapple with the non-settling tortfeasor's standing to challenge reformation, an issue of first impression in this State.[12]

Determining the right of a putative third party beneficiary to challenge reformation of a general release requires analysis of the interplay between the RESTATEMENT (SECOND) OF CONTRACTS Section 155 (1981) and Section 311 (1981).

■ RESTATEMENT (SECOND) OF CONTRACTS Section 155 (1981) addresses reformation of a contract based on a mutual mistake. It provides:

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, *except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.*

(Emphasis added.) Thus, reformation is not permitted, even in the presence of a mutual mistake, were it would be unfair to third parties to reform the original contract. RESTATEMENT (SECOND) OF CONTRACTS Section 155 Comment f explains when reformation will be denied as a remedy because it would be unfair to third parties:

> *Protection of innocent third parties.* The claim of a mistaken party to refor-

mation, being equitable in its origin, is *subject to the rights of good faith purchasers for value and other third parties who have similarly relied on the finality of a consensual transaction in which they have acquired an interest in property.* Such other third parties include those who have given value and come within the definition of "purchaser" in Uniform Commercial Code section 1–201(33), (32), notably mortgagees, pledges and other holders of a security interest. Judgment creditors and trustees in bankruptcy are not included.

(Emphasis added) (citation omitted). Though the phrase "third party" is not defined, it is clearly broad enough to include third party beneficiaries. Thus, a third party beneficiary to a general release cannot summarily block reformation of the release unless the third party beneficiary is a good faith purchaser for value or has acquired an interest in property in reliance on the release. We so held as to the Appellants in *Lunceford:*

> [Reformation] may not be available in situations where reformation would unfairly affect the rights of third parties. RESTATEMENT (SECOND OF CONTRACTS, Section 155 cmt. f (1981)). This principal [sic] applies in the context where the third party is a good faith purchaser for value. *Id.* It may also apply where the third party relies upon a property interest acquired under the original contract language. *Id.* While respondents [referring to Appellants]

---

non-settling tortfeasor in a personal injury case, with the other party to the release not being named in the lawsuit at all. Sometimes, no formal reformation claim will be filed in a pleading, though evidence of a mutual mistake may be offered to counter an affirmative defense of release asserted by a non-settling tortfeasor.

**12.** *Everhart* did involve a non-settling tortfeasor who was permitted to intervene in a reformation action between the settling tortfeasors. 898 S.W.2d at 636. However, the fact of intervention, though mentioned in the case, appears not to have been contested. *Id.* Standing of a non-settling tortfeasor to contest the sufficiency of the evidence to support reformation was thus assumed, but not discussed.

might contend that this principle applies, here, it is difficult to see how they would be *unfairly* affected by reformation of the release. They were not party to the prior settlement and neither contributed funds to that settlement nor otherwise compensated the Luncefords for their injuries. There is no showing that respondents relied to their detriment upon the original release. Moreover, the effect of the language of the original release would be to grant respondents a windfall, by absolving them of potential liability for those injuries without any action or contribution on their part. See *Everhart v. Crabb*, 775 S.W.2d 335, 338 (Mo.App.1989).

*Lunceford*, 170 S.W.3d at 464 n. 4.

A completely different question, however, is the extent to which a third party has the right to challenge the *evidentiary support* for reformation, even if the third party cannot summarily block reformation as an available remedy. In other words, when can a third party who is not a good faith purchaser for value and who has not acquired a property interest in reliance on an original contract, nonetheless inject itself in a reformation action to contest the sufficiency of evidence to find a mutual mistake warranting reformation?

 The answer to this question differs depending upon whether the third party will merely be affected by reformation of a contract or whether the third party can establish that it is an intended third party beneficiary[13] to the contract being reformed. If a third party is *not* an intended third party beneficiary to the

original contract, the third party has no standing to challenge the sufficiency of the evidence to support a judgment of reformation, absent allegations that reformation is being sought to perpetrate a fraud against the third party. *See, e.g. Merrimack Mut. Fire Ins. Co. v. Allied Fairbanks Bank*, 678 S.W.2d 574, 577 (Tex. Ct.App.1984). The theory is that if a third party has no right to independently enforce a contract, then the third party should have no right to interfere with efforts to reform the contract (absent application of RESTATEMENT (SECOND) OF CONTRACTS Section 155 (1981)) even though the third party may well have a substantial interest in the enforcement or reformation of a contract. *Id.*

However, in the case of an intended third party beneficiary, this logic does not apply. An intended third party beneficiary has the right to independently enforce the contract.[14] There are limits, therefore, on when an intended third party beneficiary's rights can be varied. The RESTATEMENT (SECOND) OF CONTRACTS Section 311 (1981) addresses these limits. That section provides:

(1) Discharge or modification of a duty to an *intended* beneficiary by conduct of the promise or by a subsequent agreement between promisor and promisee is ineffective if a term of the promise creating the duty so provides.

(2) In the absence of such a term, the promisor and promisee retain power to discharge or modify the duty by subsequent agreement.

---

**13.** The RESTATEMENT (SECOND) OF CONTRACTS Section 302 Comment a (1981) characterizes an "intended" beneficiary as a protected beneficiary who acquires a right by virtue of a promise, while an "incidental" beneficiary is an unprotected beneficiary who does not acquire rights. The concept of "in-

tended beneficiaries" includes both "creditor" and "donee" beneficiaries-the classifications of protected beneficiaries employed in the original RESTATEMENT OF CONTRACTS Section 133 (1932).

**14.** See note 13.

(3) Such a power terminates when the beneficiary, before he receives notification of the discharge or modification, materially changes his position in justifiable reliance on the promise or brings suit on it or manifests assents to it at the request of the promisor or promisee. RESTATEMENT (SECOND) OF CONTRACTS Section 311 (1981). (Emphasis added.)

 As applied to releases, RESTATEMENT (SECOND) OF CONTRACTS Section 311 (1981) would permit the parties to a general release to *amend* the general release to affect a non-settling tortfeasor's beneficiary status at any time *until*, without notice of the amendment, a non-settling tortfeasor has materially changed his position in justifiable reliance on the general release or brings suit on it or manifests assents to it.[15] In other words, until a non-settling tortfeasor knows about the general release and takes some action to assert its application to the non-settling tortfeasor, the general release can be freely modified.

The phrase "brings suit on" in RESTATEMENT (SECOND) OF CONTRACTS Section 311(3) (1981) has been interpreted to prohibit *amendment* to a general release attempted *after* a non-settling tortfeasor has knowledge of the general release, and in particular after the non-settling tortfeasor asserts the bar of the release in defending a claim. *See, e.g., Kawasaki Motors Corp. v. Cessna Aircraft Co.*, 830 F.2d 535 (4th Cir.1987). In *Kawasaki Motors*, Kawasaki's amendment of

its answer in a products liability case to set up a release defense and a related motion for summary judgment on that defense constituted "bring[ing] suit on" the promise of release made to third party beneficiaries of the general release, preventing the parties to the general release from thereafter *amending* the release. *Id.* at 539.[16]

Though the RESTATEMENT (SECOND) OF CONTRACTS Section 311 (1981) prohibits the parties to a contract from *amending* the contract to impair a beneficiary's rights after the beneficiary has materially changed his position in justifiable reliance on the contract, this section does not address *reformation*. As herein noted, a third party beneficiary's ability to block reformation of a contract is instead controlled by RESTATEMENT (SECOND) OF CONTRACTS Section 155 (1981), which limits a third party from preventing reformation to the much narrower safety net of a person who is a good faith purchaser for value or who has acquired a property interest in reliance on the original contract. The differing capacity afforded third party beneficiaries to prevent variance of contract rights by *amendment* versus *reformation* is a result of the qualitative difference between the two legal principles. Contract amendment is grounded in the parties' freedom to modify a contract at any time after its making, with an amendment taking effect at the time it is made. Reformation is grounded in a court's equitable power to reform a contract to express the parties'

---

**15.** A non-settling tortfeasor who falls within the scope of a general release has a recognized right under Missouri law to enforce the general release. *Andes v. Albano*, 853 S.W.2d 936, 942 (Mo. banc 1993). Thus, under Missouri law, a non-settling tortfeasor is an "intended beneficiary," whether or not identified in the general release by name, and whether or not expressly discussed or considered by

the settling parties at the time of execution of the general release.

**16.** However, the court left open the possibility that one or both parties to the general release could establish a mutual mistake sufficient to warrant reformation. *Kawasaki*, 830 F.2d at 539.

original intent retroactive to the date of the original contract. *Lunceford,* 170 S.W.3d at 464. Amendment of a contract impairs a third party beneficiary's rights, but only on a going forward basis. Reformation of a contract vitiates the third party beneficiary's status as of the date the contract was made, removing a benefit that was never intended.

The interplay of RESTATEMENT (SECOND) OF CONTRACTS Section 155 (1981) and Section 311 (1981) does, however, leave us with a class of intended third party beneficiaries whose rights will be varied by *reformation* of a contract, who are not innocent third parties as described in RESTATEMENT (SECOND) OF CONTRACTS Section 155 Comment f (1981), but who would be able to block *amendment* of the contract pursuant to RESTATEMENT (SECOND) OF CONTRACTS Section 311 (1981) because they have materially changed their position in justifiable reliance on the contract. It follows that a third party beneficiary in this class should have standing to challenge the *sufficiency of the evidence* to support reformation as, in the absence of sufficient evidence to support reformation, a change in the contract varying the third party beneficiary's rights would be an impermissible amendment.

 We therefore conclude that where reformation of a contract is sought *after* an intended third party beneficiary would be able to prevent an *amendment* to the contract pursuant to RESTATEMENT (SECOND) OF CONTRACTS Section 311 (1981), the third party beneficiary has standing to challenge the sufficiency of the evidence to support reformation.[17]

As applied to this case, the Release unambiguously released Appellants. *Lunceford,* 170 S.W.3d at 460–61. The Appellants were thus intended third party beneficiaries of the Release with the power to enforce its terms. *Andes,* 853 S.W.2d at 942; RESTATEMENT (SECOND) OF CONTRACTS Section 302 (1981). The Appellants could not summarily prevent *reformation* of the Release under . RESTATEMENT (SECOND) OF CONTRACTS Section 155 (1981) because they were not good faith purchasers for value and had not acquired a property interest in reliance on the Release. However, the efforts of the Luncefords and GuideOne to correct the Release occurred *after* the Appellants had raised the bar of the Release as a defense to the Luncefords' personal injury claims. Thus, the Appellants had materially changed their position in justifiable reliance on the Release and could have prevented an *amendment* of the Release pursuant to RESTATEMENT (SECOND) OF CONTRACTS Section 311 (1981). Therefore, the Appellants had standing to challenge the sufficiency of the evidence to support the Luncefords' claim for *reformation* as, in the absence of evidence sufficient to support reformation, the corrective release documents would have been impermissible amendments of the Release.

As noted, the trial court erroneously *questioned* the Appellants' standing to challenge reformation and/or to seek to

---

17. We emphasize that this right only arises at the point when the contract could not otherwise be amended to vary the third party beneficiary's rights pursuant to RESTATEMENT (SECOND) OF CONTRACTS Section 311 (1981). Just as a contract can be freely amended to vary a third party beneficiary's rights at any time, without the third party beneficiary's consent, up to the point of the third party beneficiary's material detrimental reliance on the original contract, so too can the contract be reformed, without the third party beneficiary's consent or right to intervene or otherwise participate in a reformation proceeding up to that point in time.

enforce the Release. However, the trial court did not conclude that the Appellants lacked standing, did not treat the Appellants as if they lacked standing, and did not enter its Judgment finding the Release should be reformed because the Appellants lacked standing. Point Seven is denied.

### Conclusion

The Judgment reforming the Release is supported by clear, cogent, and convincing evidence. Negating Appellants' third party beneficiary status by reformation of the Release is not an inequitable result. The Release gave the Appellants a "free ride" without their knowledge, their consent, or their payment of any consideration in so far as the Luncefords were concerned. As the evidence supported the remedy of reformation of the Release, Appellants stand in no equitable position to complain. Reformation of the Release in this case has caused no greater effect than to deprive Appellants of a windfall. We see nothing inequitable about such a result. The trial court's Judgment is affirmed.

All concur.