

## In the
## Missouri Court of Appeals
## Western District

| | |
|---|---|
| DENNIS FASTNACHT AND<br>JONI FASTNACHT, ET AL., | WD78705 |
| **Appellants,** | OPINION FILED: |
| v. | April 12, 2016 |
| TENG GE, ET AL., | |
| **Respondents.** | |

**Appeal from the Circuit Court of Cass County, Missouri**
**The Honorable J. Michael Rumley, Judge**

**Before Division Three:**
**James Edward Welsh, P.J., Thomas H. Newton, and Anthony Rex Gabbert, JJ.**

Dennis and Joni Fastnacht ("the Fastnachts") appeal the circuit court's judgment ordering reformation of the legal descriptions in four deeds of trust that they signed as grantors in 2001 and reformation of the legal descriptions in subsequent deeds whereby CitiMortgage ("Citi") sold three of the same properties to Teng Ge and his wife, Yahtzen Gu. We affirm.

### Background

Viewed in the light most favorable to the judgment,[1] the evidence at trial showed that Dennis Fastnacht ("Fastnacht") is a real estate developer, who has developed several residential projects, including multi-family homes, over the past thirty years. On August 4, 2000, the

---

[1]*Walton v. City of Berkeley,* 223 S.W.3d 126, 128 (Mo. banc 2007).

Fastnachts first acquired title to the real property at issue in this case with the intent to build townhomes on it. The property was described as:

> All of lots 47 through 57, inclusive, Remington Village 3rd Plat, a subdivision in Raymore, Cass County, Missouri, according to the recorded plat thereof[.]

On Lot 51 of this property, Fastnacht constructed four attached townhomes ("the Fourplex"), which had street addresses of 502, 504, 506, and 508 Allen Court in Raymore. After completing the Fourplex in 2001, the Fastnachts began using it as rental property.

In March 2001, the Fastnachts sought a refinance loan from Mid-America Mortgage Services ("Mid-America") for the Fourplex. Mid-America made collateralized loans -- *i.e.*, loans secured by deeds of trust. Fastnacht testified that he applied for the loans over the telephone and identified the proposed collateral as "502, 4, 6, and 8 Allen Court." Fastnacht supplied the information for the loans, and Mid-America filled out the applications, as was its custom. Fastnacht provided valuations for the four properties as being between $100,000 and $115,000 each. He stated that he based each valuation on "what [he] thought it might appraise at" and that his estimates assumed access to each unit. Fastnacht acknowledged that, without access, the value of each unit would be "substantially less." Fastnacht was aware that Mid-America was authorized to lend only 75% of the value of the collateral. Mid-America loaned $82,100 against the property at 502 Allen Court and $83,100 against each of the remaining three properties.

Mid-America contacted Lovelace and Associates ("Lovelace") to prepare surveys on the properties, which the Fastnachts paid for at closing. In preparing the surveys, Lovelace provided a legal description for each of the properties that described only the land encompassed by the four structural walls of each townhome. The legal descriptions did not include any of the surrounding property (the driveways, green space, sidewalks, or patios) and, thus, did not include

2

any access to the properties. Mid-America unwittingly placed these legal descriptions into the four deeds of trust that were executed by the Fastnachts in favor of Mid-America.

At the closing on June 19, 2001, Mid-America presented Fastnacht with four separate loan packages with four separate loan applications, deeds of trust, closing/settlement statements, and compliance agreements. The Fastnachts signed all of the documents and secured the four loans with the properties at 502, 504, 506, and 508 Allen Court.[2] Each deed of trust identifies real property and its "appurtenances and fixtures" as collateral for each loan. The four loan applications, closing/settlement statements, and compliance agreements all identify each property by its street address. In the compliance agreements, the Fastnachts agreed to provide a marketable interest to their lender and agreed to cooperate in correcting any errors in the loan documentation, including the deeds of trust.

Shortly thereafter, Mid-America assigned all of its interests in the deeds of trust to Firstar Bank, N.A. Firstar then assigned all of its interests in the deeds of trust to Mortgage Electronic Registration Systems, Inc., for the benefit of CitiMortgage, Inc.

In 2009, the Fastnachts defaulted on these loans, and the 502, 504, and 506 properties were foreclosed upon. Fastnacht saved the 508 property from foreclosure. Federal Home Loan Mortgage Corporation ("Freddie Mac") eventually purchased and acquired title to the foreclosed properties. In March of 2011, Freddie Mac conveyed title to the three properties to Citi. Citi then sold the properties to Ge and Gu and conveyed title to them by special warranty deed. In each transfer, the legal descriptions were the same as those contained in the 2001 deeds of trust.

---

[2]The evidence showed that, despite securing four separate loans, the Fastnachts did not obtain approval from the city for a "lot split," as required by city code, nor did they create a "condominium covenant" in order to provide access to the properties and usage of the common areas in the event of foreclosure.

In his deposition, Fastnacht testified that, sometime after foreclosure, he went to the courthouse to determine the amount of his real estate tax bill. There, he discovered that the greenspace, sidewalks, patios, and driveways did not appear in the deeds to the foreclosed properties and that he was paying taxes on these surrounding areas. Fastnacht stated that the collector's office told him: "There's a serious problem with the transfer of the ownership of this property because you [Fastnacht] own the land all the way around it." Fastnacht stated, "That's when the lights went on," and he realized that he could claim ownership to the property surrounding the Fourplex.

When Fastnacht later encountered Ms. Gu on the property, he told her that "there is a problem with this property that you may not be aware of" and he "encouraged" her to contact "someone that's knowledgeable in real estate law[.]" Gu testified that Fastnacht told her that he owned the surrounding property and that the houses she bought are "without access." Fastnacht later put up no trespassing signs and interfered with Ge and Gu's tenants' access to the properties.

In May 2011, after becoming aware of the legal description errors, Citi filed a petition against the Fastnachts for establishment of an easement to obtain access to the three properties. In July 2011, the Fastnachts filed their answer and a third-party petition against Ge and Gu. Citi moved for dismissal of its petition. In response to the Fastnachts' petition, Ge and Gu filed an answer and cross-claim seeking, *inter alia*, reformation of the vesting deeds for their properties, or, alternatively, easements. In 2012, Citi gained permission to come back into the case, and it sought reformation of the deed of trust on 508 Allen Court (still owned by the Fastnachts). Citi also joined Ge and Gu in requesting reformation of the deeds for their three properties.[3]

---

[3]In 2012, the circuit court entered summary judgment in favor of the Respondents and ordered reformation. In January 2013, the Fastnachts' motion for new trial came before a newly-assigned judge, who set aside the summary judgment and set the matter for trial.

4

The matter proceeded to trial in March 2015, and the foregoing evidence was presented. The circuit court entered judgment in favor of the Respondents. The court decreed that the parties, by mutual mistake, had omitted the description of the surrounding areas in the deeds of trust. The circuit court ordered reformation of Ge and Gu's 2011 deeds to their three properties and of Citi's 2001 deed of trust on 508 Allen Court to correct the legal descriptions to include the surrounding areas. The court further decreed that the Fastnachts have no interest in and to 502, 504, and 506 Allen Court, and that Ge and Gu are the fee simple owners of those properties. The judgment sets forth all four of the reformed legal descriptions in full.[4]

### Standard of Review

An action for the reformation of a written contract is an equity action that is tried by the court. *Lunceford v. Houghtlin,* 326 S.W.3d 53, 61 (Mo. App. 2010). Thus, we will affirm the judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). As to claims that "there is no substantial evidence to support the judgment or that the judgment is against the weight of the evidence," we defer to the circuit court's assessment of the evidence and will overturn the judgment only when we have a firm belief that it is wrong. *Pearson v. Koster,* 367 S.W.3d 36, 43-44 (Mo. banc 2012). We view the evidence and inferences in the light most favorable to the judgment, and we disregard all evidence and inferences to the contrary. *Walton*, 223 S.W.3d at 128. We review a claim that the court erroneously declared or applied the law *de novo*. *Pearson,* 367 S.W.3d at 43.

Where, as here, the parties seek to reform a contract on the ground of mutual mistake, the "mistake must appear by clear and convincing evidence." *U.S. Bank, N.A. v. Smith*, 470 S.W.3d

---

[4]The reformed legal descriptions are set forth in full in the Appendix to this opinion, *infra*.

5

17, 25 (Mo. App. 2015). "For reformation on grounds of mistake, the primary factual issues to be established are the existence of a prior agreement and mutual mistake." *Black & Veatch Corp. v. Wellington Syndicate*, 302 S.W.3d 114, 126 (Mo. App. 2009).

**Discussion**

**In Point I,** the Fastnachts claim that the circuit court erred in granting reformation both because there is no substantial evidence to support it *and* because it is against the weight of the evidence in that there was no showing by clear, cogent, and convincing evidence of a preexisting agreement and a mutual mistake that resulted in documents that do not reflect the agreement.

This Court has repeatedly explained that an "against-the-weight-of-the-evidence" challenge is not the same as a "not-supported-by-substantial-evidence" challenge. *See, e.g., Hopkins v. Hopkins*, 449 S.W.3d 793, 802-03 (Mo. App. 2014); *Sauvain v. Acceptance Indem. Ins. Co.,* 437 S.W.3d 296, 299 n. 1 (Mo. App. 2014);[5] *accord Ivie v. Smith*, 439 S.W.3d 189, 208 n. 11 (Mo. banc 2014). Rather, they are "separate and distinct challenges." *Hopkins*, 449 S.W.3d at 802. Thus, the Fastnachts' first point asserts two "separate and distinct" legal bases for reversal. Multiple claims of error in one point relied on render the point "multifarious" and

---

[5]In *Sauvain*, 437 S.W.3d 296, this Court explained that, in bringing a ***not-supported-by-substantial-evidence*** challenge, the appellant must:

> (1) identify a challenged factual proposition necessary to sustain the judgment; (2) identify all of the favorable evidence supporting that position; and (3) demonstrate why that supporting evidence, when considered with the reasonable inferences drawn therefrom, is so lacking in probative value that the trier of fact could not reasonably believe the proposition.

*Id*. at 303. In such a challenge, "[a]ny citation to or reliance upon evidence and inferences contrary to the judgment is irrelevant and immaterial to [the] appellant's point and argument." *Id*. On the other hand, an appellant bringing an ***against-the-weight-of-the-evidence*** challenge, must:

> (1) identify a challenged factual proposition necessary to sustain the judgment; (2) identify all of the favorable evidence supporting that position; (3) identify contrary evidence, subject to the trial court's credibility determinations, explicit or implicit; and (4) prove in light of the whole record that the supporting evidence, when considered along with the reasonable inferences drawn therefrom, is so lacking in probative value that the trier of fact could not reasonably believe the proposition.

*Id.* at 304.

6

violate Rule 84.04. Pursuant to Rule 84.04(d), these two challenges should have been set forth in two distinct points relied on. *See id.* As a general rule, multifarious points preserve nothing for appellate review and, thus, are subject to dismissal. *Id.*; *Day v. State,* 208 S.W.3d 294, 295 (Mo. App. 2006). Accordingly, we dismiss Point I. In any event, both of these claims are without merit, as established in our discussion of Point II, *infra*.

**In Point II,** the Fastnachts argue that the circuit court erred in granting reformation because (1) the court erroneously declared the law or erroneously applied the law by not requiring clear, cogent, and convincing evidence of a preexisting agreement and a mutual mistake, and (2) "there was not clear, cogent and convincing evidence of such."

First, the Fastnachts claim that the circuit court erroneously declared or erroneously applied the law by not applying the clear, cogent, and convincing standard for reformation. Such a claim involves review of the propriety of the circuit court's construction and application of the law. *Pearson,* 367 S.W.3d at 43. We review such claims *de novo*. *Id.*

The Fastnachts rely on *Ethridge v. TierOne Bank,* 226 S.W.3d 127 (Mo. banc 2007); *U.S. Bank National Association v. Cox*, 341 S.W.3d 846 (Mo. App. 2011); and *Federal National Mortgage Association v. Pace,* 415 S.W.3d 697 (Mo. App. 2013), in support.[6] After examining the facts and rulings in those cases, the Fastnachts declare that "[t]he present case has facts that are even weaker in arguing for reformation." From this, they conclude that the circuit court failed to apply the clear, cogent, and convincing standard for reformation. This does not constitute a claim that the court misapplied the law; it is simply a claim of factual error.

---

[6]These three cases are inapposite: *Pace* did not involve reformation. 415 S.W.3d 697. *TierOne* did not involve an incorrect legal description but concerned a deed of trust that failed to identify the wife as a grantor. 226 S.W.3d at 132. Similarly, in *Cox*, the court found that all three elements for reformation of the legal description in a deed of trust were met but denied reformation because the husband's signature was missing. 341 S.W.3d at 854-56.

The Fastnachts also raise the factual claim that there **was no** clear, cogent, and convincing evidence to support the judgment. As noted, a factual claim "involves review of the trial court's factual determinations." *Pearson,* 367 S.W.3d at 43. We will overturn the circuit court's judgment under a fact-based standard of review only when we have a firm belief that the judgment is wrong. *Id.* In reviewing questions of fact, we defer to the circuit court's assessment of the evidence. *Sauvain,* 437 S.W.3d at 303.

To the extent that the Fastnachts are asking us to decide whether there was clear, cogent, and convincing evidence, we note that the "clear, cogent, and convincing" standard is addressed to the fact finder. *See In re D.J.G.*, 426 S.W.3d 700, 711 n. 4 (Mo. App. 2014). The reviewing court determines whether there was "substantial evidence" to support the decision. *See id.*

The Respondents in this case sought to reform the legal descriptions in the deeds of trust. "'In seeking reformation, it must be established that a mistake occurred that caused the contract language to differ from what the parties intended in their agreement.'" *Smith*, 470 S.W.3d at 25 (quoting *Lunceford,* 326 S.W.3d at 63). The party seeking reformation has the burden of showing by clear, cogent, and convincing evidence: "(1) a preexisting agreement between the parties to describe the tract in accordance with the proposed reformation; (2) the mistake; and (3) the mutuality of the mistake." *Id.* To establish a mutual mistake, it is not necessary to show that the parties had agreed upon any particular words or language to be used in the instrument, "it is sufficient to show that they agreed to accomplish a particular object by the instrument to be executed and that such instrument, as executed, is insufficient to effectuate their intention." *Thompson v. Koenen*, 396 S.W.3d 429, 434 (Mo. App. 2013). "[R]eformation *may be established by circumstantial evidence* provided that the natural and reasonable inferences drawn from it clearly and decidedly prove the alleged mistake." *Lunceford*, 326 S.W.3d at 64. A circuit court

8

weighing reformation must consider many things, including the "wording of the contract[,] the relationship of the parties, the subject matter of the contract[,] the circumstances surrounding the execution of the contract, and its interpretation by the parties." *Id.*

Here, the circuit court found that "[b]oth the Fastnachts and Mid-America intended that the four deeds of trust would include a full legal description for each property that included driveways, green space, patios, sidewalks, and porches" and that the four deeds of trust did not express that mutual intent. The court further found that "the incorrect legal descriptions were due to a material mutual mistake of fact," in that, when they entered into the loans, both parties were unaware that the legal descriptions in the deeds of trust described only "the four structural corners of each of the Properties."

We find that substantial evidence supported the circuit court's judgment. The documents presented at trial reflect the parties' mutual agreement that each loan is secured by a specific individual townhome to be used as rental property. The closing documents all identify a complete townhome by street address as collateral, and, in the compliance agreements, the Fastnachts agreed to provide a marketable interest to the lender and to cooperate in correcting any errors in the loan documentation. In addition, the deeds of trust included various provisions that granted Mid-America access to the properties under certain circumstances (including foreclosure). Under the deeds as written, that was not possible.

The testimony of both Fastnacht and Mid-America's agent established that they both intended for the deeds of trust to cover more than just the four corners of the buildings. The agent for Mid-America testified that Lovelace provided erroneous legal descriptions and that Mid-America mistakenly incorporated them into the deeds of trust. The agent further testified

9

that Mid-America would not knowingly obtain deeds of trust from the Fastnachts that did not provide access or describe the surrounding areas.

Fastnacht testified that he built the townhomes as rental properties. He stated that he pledged the townhomes as collateral for the loans and that he valued each as inclusive of access via the surrounding areas. He admitted that the townhomes without access would be worth substantially less than the amounts he represented in the loan applications and the $332,400 loaned to him. Fastnacht testified that he would never knowingly defraud or cheat Mid-America, that he would never misrepresent the collateral he was offering, and that he was always accurate and honest with his lenders during the loan process.

Nevertheless, Fastnacht insisted at trial that he intended for the refinanced loans to encumber only the "four corners" or "structural footprint" of each townhome. While he stated that he only "scanned" the deeds of trust at the 2001 closing, he also claimed that he saw the legal descriptions and appreciated that it was for the "four corners" of each of the townhomes. He testified in his deposition, however, that it was only after foreclosure that he discovered that the greenspace, sidewalks, patios, and driveways did not appear in the deeds to the foreclosed properties and that he was paying taxes on these surrounding areas. He stated that "[t]hat's when the lights went on" and he realized that he could claim ownership to the property surrounding the Fourplex. Thus, when he later saw Ms. Gu on the property, he informed her that "there is a problem with this property that you may not be aware of."

As noted by the circuit court, at no point during the application or closing process did Fastnacht indicate that he was pledging only the "four corners" of each townhome. Moreover, even when Fastnacht was working to save the properties from foreclosure, he never mentioned

10

that the deeds of trust would preclude access to the properties post-foreclosure, and he made no attempt to use that fact as leverage to modify his loans.

The foregoing reveals Fastnacht's lack of knowledge as to what was contained in the deeds of trust prior to his trip to the county collector's office and establishes that, at the time of closing, Mid-America and the Fastnachts shared a misconception that the deeds of trust would encumber the entire Properties. In weighing reformation, the circuit court properly considered the language of the deeds of trust, the other documents signed by the parties, the parties' relationship, the subject matter of the transaction, the circumstances surrounding the execution of the deeds of trust, and their interpretation by the parties. *See id.* All of this constituted substantial evidence from which the court could properly conclude that there was clear, cogent, and convincing evidence of a preexisting agreement for the deeds of trust to encumber the entire properties and a mutual mistake in omitting the surrounding areas from the legal descriptions. The circuit court did not err in granting reformation.

In sum, because there is no legal error alleged, and because there was substantial evidence to support the circuit court's rulings, this point is denied

**In Point III**, the Fastnachts contend that the circuit court erroneously declared or erroneously applied the law by "not following case law that holds that equity will not relieve against mistake when the complaining party had within his reach the means of ascertaining the true state of facts." The claim is based on the principle that equity will not relieve a party from the consequences of his own negligence. The Fastnachts cite various cases in which this principle was applied. *See, e.g., Brown v. Fagan,* 71 Mo. 563 (Mo. 1880) (concerning a note in settlement of a partnership account); *Croy v. Zalma Reorganized Sch. Dist. R-V of Bollinger Cty.*, 434 S.W.2d 517 (Mo. 1968) (concerning a real estate sale where one party made an

11

unwarranted assumption as to the property being sold); and *Michie v. Nat'l Bank of Caruthersville,* 558 S.W.2d 270 (Mo. App. 1977) (concerning a foreclosure sale where buyers later discovered that they bought only a life estate, not fee simple title).

The Fastnachts do not in any way persuade us that these cases required the circuit court to deny reformation based on this principle. The cases are inapplicable to this case, where there was a *mutual mistake*. As explained, the circuit court properly applied the law as to reformation, concluded that there was a preexisting agreement and a mutual mistake, and granted reformation. We have already established that the court did not err in doing so. None of the Fastnachts' cases establish that the circuit court in this case, with the facts that were before it, misapplied the law in granting reformation after finding a preexisting agreement and a *mutual mistake*.

The Fastnachts make much of the fact that Mid-America, alone, selected and hired Lovelace. As we explained in *Smith*, however, where parties to an instrument "have reached a meeting of the minds and the instrument intended to express such agreement fails to do so by reason of the mistake of the draftsman, it is immaterial who employed him." 470 S.W.3d at 27. Here, Lovelace was retained for the mutual benefit of both parties to the transaction, and, thus, it is immaterial who hired him. Proof of his mistake in omitting the description of the surrounding areas establishes a mutual mistake. *See id*. For the foregoing reasons, this point is denied.

**In Point IV,** the Fastnachts argue that the circuit court erroneously declared the law or erroneously applied the law in finding that the Fastnachts "did not take any steps to ensure the patios, sidewalks, and driveways were not foreclosed upon." The Fastnachts contend that this is a misapplication or a misstatement of the law because they were not *required* to prevent foreclosure against the outside areas of Lot 51.

12

The Fastnachts are mistaken. This is not an erroneous declaration or application of the law; it is a finding of fact that is reviewable under the standards relating to factual determinations set forth above. This particular factual finding, coupled with the evidence showing that Fastnacht did not assert ownership over the surrounding areas until he discovered that he was still paying property taxes on them, supports the conclusion that Fastnacht mistakenly believed, at the time of the loans, that the deeds of trust covered and included those areas. Because this factual finding was not an erroneous application of the law, this point has no merit and is denied.

**In Point V,** the Fastnachts contend that the circuit court erroneously declared or applied the law by "expand[ing] the collateral that was foreclosed upon" and by ignoring the doctrine of "caveat emptor" as to property acquired after a foreclosure sale.

We have already determined that the circuit court did not err in reforming the deeds of trust based on its finding of a pre-existing agreement and mutual mistake. Thus, the Fastnachts' claim that the court "expanded the collateral that was foreclosed upon" is simply incorrect. The court's findings also properly provided the basis for reforming Ge and Gu's deeds. Where it was equitable to reform the legal descriptions in the 2001 deeds of trust due to the mutual mistake, the court did not err in ordering equitable reformation of Ge and Gu's deeds in the same manner.

As to the claim that the court failed to address the issue of "caveat emptor," in a bench-tried case, "[t]he court may, or if requested by a party shall, include in the opinion findings on the controverted material fact issues specified by the party." Rule 73.01(c). Here, the Fastnachts did not request specific findings as to the doctrine of caveat emptor (which would have been a finding as to a legal issue anyway); thus, the circuit court did not err in failing to address that issue. *See id.* In any event, "[a]ll fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Rule 73.01(c). Thus,

13

any caveat emptor issue is deemed to have been found against the Fastnachts in accordance with the result reached, which we have already determined was not erroneous. Point V is denied.

**In Point VI,** the Fastnachts contend that the circuit court erroneously declared or erroneously applied the law by not requiring the Respondents to comply with sections 228.342-.362, RSMo (the "Private Roads Statutes"). We disagree. The circuit court did not err in not addressing the Private Roads Statutes. The court's ruling reforming the legal descriptions in the deeds of trust implicitly moots any claim pertaining to a need to establish a private roadway by necessity. In light of this, it was unnecessary to address these statutes. Point VI is denied.

**In Point VII**, the Fastnachts argue that the circuit court erroneously applied the law in granting reformation by not addressing the defenses of estoppel or laches. We note, first, that the Fastnachts did not plead the defense of laches, as required by Rule 55.08, which states: "In pleading to a preceding pleading, a party shall set forth all applicable affirmative defenses and avoidances, including . . . laches[.]" Thus, any claims as to laches are not preserved for appeal.

Moreover, the Fastnachts never filed a motion to amend the form or language of the judgment as to these issues. "In all cases, allegations of error relating to the form or language of the judgment, including the failure to make statutorily required findings, must be raised in a motion to amend the judgment in order to be preserved for appellate review." Rule 78.07(c). Where such claims are not so raised, they are waived. *Stuart v. Ford*, 292 S.W.3d 508, 517 (Mo. App. 2009). This claim is not preserved for review. Consequently, this point also is denied.

### Conclusion

For the foregoing reasons, we affirm the circuit court's judgment.

 /s/ JAMES EDWARD WELSH
James Edward Welsh, Presiding Judge

All concur.

14

## Appendix

Following are the reformed legal descriptions set forth in full:

**Unit 502,** Lot 51, containing 8,165.11 Square Feet More or Less

All that part of Lot 51, REMINGTON VILLAGE, 3RD PLAT, a subdivision in Raymore, Cass County, Missouri, also known as Unit Number 502 and being more particularly described as follows:

BEGINNING at the Southwest corner of said Lot 51; thence North 01°02'29" East along the West line of said Lot 51 a distance of 26.66 feet to the Intersection of said West line and the prolongation of a line that projects through the centerline of the common interior wall between Unit Number 502 and Unit Number 504; thence North 79°24'54" East along said line a distance of 158.61 feet to the Easterly line of said Lot 51; thence Southeasterly along said Easterly line along a curve to the left whose initial tangent bears South 41°33'36" East with a central angle of 48°01'29" a radius of 50.00 feet and an arc length of 41.91 feet; thence South 00°25'00" West continuing along said Easterly line a distance of 40.00 feet to the Southeast corner of said Lot 51; thence North 89°41'33" West along the South line of said Lot 51 a distance of 193.16 feet to the POINT OF BEGINNING.

**Unit 504,** Lot 51 containing 2,699.16 Square Feet More or Less

All that part of Lot 51, REMINGTON VILLAGE, 3RD PLAT, a subdivision in Raymore, Cass County, Missouri, also known as Unit Number 504 and being more particularly described as follows:

Commencing at the Southwest corner of said Lot 51; thence North 01°02'29" East along the West line of said Lot 51 a distance of 26.66 feet to the POINT OF BEGINNING; thence North 01°02'29" East along said West line a distance of 18.02 feet to the Intersection of said West line and the prolongation of a line that projects through the centerline of the common interior wall between Unit Number 504 and Unit Number 506; thence North 79°24'54" East along said line a distance of 148.51 feet to the Easterly line of said Lot 51; thence Southeasterly along said Easterly line along a curve to the left whose initial tangent bears South 19°53'19" East with a central angle of 21°40'17" a radius of 50.00 feet and an arc length of 18.91 feet to the Intersection of said Easterly line and the prolongation of a line that projects through the centerline of the common interior wall between Unit Number 504 and Unit Number 502; thence South 79°24'54" West along said line a distance of 158.61 feet to the POINT OF BEGINNING.

1

**Unit 506,** Lot 51, containing 2,582.23 Square Feet More or Less

All that part of Lot 51, REMINGTON VILLAGE, 3RD PLAT, a subdivision in Raymore, Cass County, Missouri, also known as Unit Number 506 and being more particularly described as follows:

Commencing at the Southwest corner of said Lot 51; thence North 01°02'29" East along the West line of said Lot 51 a distance of 44.68 feet to the POINT OF BEGINNING; thence North 01°02'29" East along said West line a distance of 18.02 feet to the Intersection of said West line and the prolongation of a line that projects through the centerline of the common interior wall between Unit Number 506 and Unit Number 508; thence North 79°24'54" East along said line a distance of 145.14 feet to the Easterly line of said Lot 51; thence Southeasterly along said Easterly line along a curve to the left whose initial tangent bears South 00°26'45" West with a central angle of 20°20'03" a radius of 50.00 feet and an arc length of 17.74 feet to the Intersection of said Easterly line and the prolongation of a line that projects through the centerline of the common interior wall between Unit Number 506 and Unit Number 504; thence South 79°24'54" West along said line a distance of 148.51 feet to the POINT OF BEGINNING.


**Unit 508,** Lot 51

All that part of Lot 51, REMINGTON VILLAGE, 3RD PLAT, a subdivision in Raymore, Cass County, Missouri, also known as Unit Number 508 and being more particularly described as follows:

Commencing at the Southwest Corner of said Lot 51; thence North 01°02'29" East along the West line of said Lot 51 a distance of 62.7 feet to the point of beginning; thence North 01°02'29" East along said West Line a distance of 50.38 feet; thence South 89°26'49" East a distance of 141.98 feet; thence South 00°33'11" West a distance of 22.25 feet to the intersection of said Easterly Line and the prolongation of a line that projects through the centerline of the common interior wall between Unit Number 508 and Unite [sic] Number 506; thence South 79°24'54" West along said line a distance of 145.14 feet to the POINT OF BEGINNING.