Corrected-November 17, 2021



# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| **DERRY BECK II,** | ) | |
| | ) | |
| **Appellant,** | ) | **WD84004** |
| | ) | |
| **v.** | ) | **OPINION FILED: November 16, 2021** |
| | ) | |
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Marco Roldan, Judge

Before Division Three:  Lisa White Hardwick, Presiding Judge, Gary D. Witt, Judge and
Edward R. Ardini, Jr., Judge

Derry Beck II ("Beck") appeals the judgment of the Circuit Court of Jackson

County, Missouri ("motion court"), denying, after an evidentiary hearing, his motion for

post-conviction relief pursuant to Rule 29.15.  On appeal, Beck argues that the motion court

erred in:  (1) failing to find his trial counsel ("Counsel") ineffective for not interviewing

and calling Michael and Marcina Collins as fact witnesses at his trial; (2) failing to find

Counsel ineffective for not calling Dr. Ann Duncan-Hively as an expert witness; (3) failing

to find Counsel ineffective for not objecting to the improper opinion testimony of Dr. Emily

Killough based on the finding on direct appeal that the admission of this testimony was not plain error; (4) failing to find Counsel ineffective for failing to properly impeach the testimony of A.O. ("Victim")[1] with prior inconsistent statements; (5) failing to find Counsel ineffective for presenting Victim's forensic interview; (6) failing to find Counsel ineffective for failing to allow Beck to review his police interview because if Beck had reviewed the video he could have pointed out inconsistencies in the detective's trial testimony; (7) failing to find Counsel ineffective for failing to further question or challenge Juror;[2] (8) failing to find Counsel ineffective for failing to seek a mistrial or curative instruction after Venireperson's prejudicial statement; (9) failing to consider his amended 29.15 motion timely in violation of his rights to due process and equal protection of the law; and (10) failing to consider the argument in his untimely amended 29.15 motion that Counsel was ineffective in failing to investigate and call Dawn Crosley as a witness at his trial. Finding no error we affirm the judgment of the motion court.

**Factual and Procedural Background[3]**

Beck and Victim's mother separated from each other by the time Victim was born in November of 2000. The separation was not amicable, and Victim did not have any meaningful relationship with Beck, her father, during her early years, nor was she given his last name on her birth certificate as were her two older siblings. Beck, while he was in

---

[1] We do not identify Victim by name to protect her privacy pursuant to section 595.226.

[2] To protect their privacy, we do not identify the juror or the venireperson discussed in Point VIII by name.

[3] Much of the factual background set forth here is taken from the direct appeal of this matter, *State v. Beck*, 557 S.W.3d 408 (Mo. App. W.D. 2018), without further attribution.

Missouri, lived with his mother, Mary Beck, in Blue Springs. Beck was absent from Missouri at various times for extended periods during Victim's childhood, including when he spent time in Mexico, when he attended scuba dive school in Florida, when he worked as a diver on oil rigs in the Gulf off of Louisiana, and when he spent time as a diver or performed diving-related activities in Guam.

At some point, Victim's older siblings went to live with Beck at his mother's house. During that time period, Victim would come visit her siblings and Beck. These visits varied in frequency, and some visits were overnight. When Victim stayed overnight at Beck's mother's house, she did not have a dedicated bedroom but would sleep either in a guest bedroom, in her brother's bedroom, or in her sister's bedroom on a pallet on the floor.

When Victim was approximately five or six years old, she was in a guest bedroom at Beck's mother's house, and Beck was looking at pictures of women on a computer. Beck told Victim to come to him and he pulled down her pants and placed his penis in her anus. He then placed his penis in Victim's mouth and told her to "suck it like a lollipop." He told Victim, "This will be our little secret." Beck put his penis in Victim's anus on several other occasions when she was at Beck's mother's house, and placed his penis in Victim's mouth more times than she could count. When Victim was older, in approximately fifth grade, Beck tried on two separate occasions to put his penis in her vagina, although she fought him and he was unable to rape her. During one of those two occasions, Beck put his mouth on Victim's vagina. Victim believes that Beck sexually abused her for the last time when she was approximately twelve or thirteen years old and in the sixth grade. After Beck had stopped abusing Victim, he asked her to go out to dinner with him for her birthday.

3

Victim's sister encouraged her to go, and Victim went because she did not want to explain to everyone why she refused. During that dinner, Beck apologized to Victim for molesting her and asked her to forgive him.

Victim later disclosed the abuse to her cousin, to whom Victim was close. Victim asked the cousin not to tell anyone about the abuse, but the cousin told a trusted teacher at school and then a school counselor. After it was reported, the Children's Division informed Victim's mother about the abuse. Victim then disclosed the abuse to her mother and her older sister, who subsequently moved out of Beck's mother's house and moved back in with Victim and her mother. Victim's mother filed a police report and Beck was arrested and was charged with multiple counts for his abuse of Victim.

Victim participated in a videotaped forensic interview at the Child Protection Center, during which she detailed the abuse. Victim also was examined at Children's Mercy Hospital, and she was tested for sexually transmitted diseases. Although the results of her physical exam were normal, the doctor, who was specially trained in child sexual abuse, diagnosed Victim with child sexual abuse, and Victim underwent several therapy sessions at Children's Mercy Hospital.

After a jury trial, Beck was convicted of three counts of first-degree statutory sodomy and one count of first-degree child molestation. The jury found that Beck anally sodomized Victim with his penis, placed his penis in Victim's mouth, placed his mouth on Victim's vagina, and touched Victim's vagina with his penis. The first three acts occurred when Victim was less than twelve years old, and the last act occurred when Victim was less than fourteen years old. Beck was sentenced by the trial court, and received concurrent

4

terms of twenty years in prison for each count of statutory sodomy and fifteen years for child molestation.

On direct appeal, this Court affirmed his conviction for one count of statutory sodomy for placing his mouth on Victim's vagina, but reversed the convictions for two counts of statutory sodomy and the one count of first-degree child molestation as being violative of the principles set forth in *State v. Celis-Garcia*, 344 S.W.3d 150, 154 (Mo. banc 2011) pertaining to jury unanimity.[4] *State v. Beck*, 557 S.W.3d 408 (Mo. App. W.D. 2018). This Court's mandate affirming the conviction and sentence for the one surviving count was issued on October 31, 2018. Beck retained private counsel who filed a post-conviction motion pursuant to Rule 29.15 on January 24, 2019. On January 28, 2019, the motion court purported to grant Beck ninety days to amend his post-conviction motion. On April 9, 2019, retained counsel filed a motion for an extension of time for an additional thirty days to file the amended motion, which the motion court granted. On May 24, 2019, Beck's retained counsel filed an amended motion. On August 20, 2019, the State responded to Beck's amended motion, asserting that the amended motion was not timely.

On December 18-19, 2019, the motion court held an evidentiary hearing at which multiple witnesses testified. On January 31, 2020, by agreement with the State, Beck filed the depositions of Michael Collins, Marcina Collins, and Dawn Foster Crosley, and several exhibits to supplement the evidentiary record developed at the hearing. On June 29, 2020, the motion court issued findings of fact, conclusions of law, and a judgment denying Beck

---

[4] The State dismissed the counts which were reversed following the appellate opinion on direct appeal.

relief. On August 31, 2020, the motion court denied Beck's motion to amend the judgment. This appeal follows.

## Standard of Review

We review the denial of a Rule 29.15 motion for post-conviction relief "to determine whether the motion court's findings of fact and conclusions of law are clearly erroneous." *Watson v. State*, 520 S.W.3d 423, 428 (Mo. banc 2017); Rule 29.15(k). "A judgment is clearly erroneous when, in light of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Id.* (quoting *Swallow v. State*, 398 S.W.3d 1, 3 (Mo. banc 2013)). "The motion court's findings of fact and conclusions of law are presumed to be correct." *Hays v. State*, 360 S.W.3d 304, 309 (Mo. App. W.D. 2012) (quoting *Edwards v. State*, 200 S.W.3d 500, 509 (Mo. banc 2006)).

## Analysis

Two of Beck's points on appeal (Point IX and Point X) involve the motion court's finding that Beck's amended motion was untimely and the motion court's refusal to consider any allegations in the amended motion that were not included in the original motion. For ease of analysis, we will address Beck's Points IX and X out of order. We will first address Beck's claim on appeal (Point IX), that the motion court erred in refusing to consider his amended motion timely filed.

### *Timeliness of Amended Motion; Point IX*

Beck claims that the motion court erred in finding that his amended 29.15 motion was untimely because the motion court improperly granted an additional thirty-day extension of time in which to amend the motion and because his retained counsel

6

effectively abandoned him by failing to file an amended motion within the time allowed by the Rule. Beck's arguments were expressly rejected by our Supreme Court in *Gittemeier v. State*, 527 S.W.3d 64 (Mo. banc 2017), holding; 1) the time limits of rule 29.15 are mandatory and the motion court does not have the authority to extend them and 2) the abandonment doctrine is solely applicable to appointed counsel and cannot be applied to retained counsel. Beck acknowledged at oral argument that this court was bound by that decision. Beck's amended motion was not timely filed and he is not entitled to an abandonment hearing.

Based upon the binding precedent of *Gittemeier*, Beck's Point IX is denied.

### *Ineffective assistance claim raised in amended motion; Point X*

Beck's Point X alleges error in the motion Court's failure to consider the argument in his untimely amended 29.15 motion that Counsel was ineffective in failing to investigate and call Dawn Crosley as a witness at his trial. However, this allegation was not included in his original motion, only in his untimely filed amended motion. As such, this claim is waived and not subject to review. *See Gittemeier*, 527 S.W.3d at 71.

Point X is denied.

**Ineffective Assistance of Counsel**

The remainder of Beck's points on appeal involve claims of ineffective assistance of Counsel.

> To establish ineffective assistance of counsel, a movant must prove "by a preponderance of the evidence that (1) trial counsel failed to exercise the level of skill and diligence that reasonably competent counsel would exercise in a similar situation and (2) the movant was prejudiced by that failure." *Dorsey v. State*, 448 S.W.3d 276, 286-87 (Mo. banc 2014) (citing *Strickland*

7

*v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). If a movant fails to satisfy either prong of the *Strickland* test, he or she is not entitled to post-conviction relief. *State v. Simmons*, 955 S.W.2d 729, 746 (Mo. banc 1997).

To satisfy the performance prong, movants "must overcome the strong presumption that counsel's conduct was reasonable and effective." *Johnson v. State*, 406 S.W.3d 892, 899 (Mo. banc 2013). This presumption is overcome when a movant identifies "specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Id.* (internal quotation omitted).

To establish *Strickland* prejudice, "a movant must show a reasonable probability that, but for counsel's errors, the outcome would have been different." *Dorsey*, 448 S.W.3d at 287. "A reasonable probability exists when there is a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation omitted).

*Hoeber v. State*, 488 S.W.3d 648, 655 (Mo. banc 2016).

### *Failure to Call Fact Witnesses; Point I*

Beck's Point I argues that the trial court clearly erred in failing to find Counsel ineffective for not interviewing or calling fact witnesses, Michael Collins and Marcina Collins (collectively "The Collinses"). The Collinses were friends of Beck with whom he lived in Louisiana when he was working as diver off the coast in the Gulf of Mexico, and Beck argues that Counsel should have called them to testify at trial. To succeed on a claim of ineffective assistance for failure to call a witness, the movant must establish: "(1) trial counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense." *Davis v. State*, 486 S.W.3d 898, 909 (Mo. banc 2016). "The selection of witnesses and evidence are matters of trial

8

strategy, virtually unchallengeable in an ineffective assistance claim." *Jindra v. State*, 580 S.W.3d 635, 641 (Mo. App. W.D. 2019) (internal quotation omitted).

Beck appears to argue that the Collinses would have served as alibi witnesses at trial, but the State accurately points out that Beck did not plead an alibi defense. Counsel testified at the evidentiary hearing that Beck told him about the Collinses and that they would testify that Beck was in Louisiana during much of the time Victim stated the sexual abuse occurred. Counsel did not call them as witnesses, however, because he knew that Beck's mother was going to testify as to his whereabouts during the relevant time period, that Beck himself was going to testify, and that there were some scuba dive log books to corroborate that testimony. Counsel did not think it was necessary to call the Collinses. In addition, the Collinses' deposition testimony prepared for the evidentiary hearing was inconsistent as to what dates or even years that Beck stayed with them. Mrs. Collins stated, "I'm not exactly sure. I know that from 2008, '09, '10, '11 I had several divers coming and going. . . . I'm not even going to be able to pinpoint it." Further, both Collinses testified that during the period that Beck stayed with them, he would go back to Blue Springs, Missouri, periodically, to visit his family. Accordingly, their testimony was cumulative to other evidence and did not provide an alibi for the entire relevant time period; it would have been reasonable trial strategy not to call them as witnesses. *See Williams v. State*, 168 S.W.3d 433, 441 (Mo. banc 2005) ("Counsel will not be found ineffective for deciding not to introduce cumulative evidence."). This is so even though Counsel testified at the motion hearing that, in hindsight, he thought he should have called them. Irrespective of Counsel's testimony at the hearing that he had no strategic reason for not calling them, there

9

was no prejudice because the testimony was cumulative of other witnesses and it was speculative in that it lacked sufficient specificity as to the timeframe (or even the year) when Beck was with them, and it supported the State's position that Beck did, in fact, return home to Blue Springs during the time he stayed with the Collinses to see his family.

Point I is denied.

### *Failure to Call Expert Witness; Point II*

Beck's Point II on appeal is that Counsel was ineffective in failing to call Dr. Ann Duncan-Hively as an expert witness at trial. Dr. Duncan-Hively is a psychologist who consults and testifies in sexual abuse cases. As with fact witnesses, to succeed on a claim of ineffectiveness based upon counsel's failure to call an expert witness, the movant must establish that counsel knew or should have known of the existence of the witness; that the witness could have been found with reasonable investigation; that the witness would have testified; and that as a result of the testimony there is a reasonable likelihood that the result would have been different. *Davis*, 486 S.W.3d at 906.

In this case, Beck established that Dr. Duncan-Hively would have been available and willing to testify at his trial. Beck claims that her testimony would have aided his defense because she would have offered the opinion that Victim's forensic interview was flawed in that it was not in the form of a narrative and in that the questions were riddled with "insertions" that directed Victim's answers and led her to answer in a certain way. The motion court found that Duncan-Hively's testimony would not have given Beck a viable defense. We agree.

10

First, there was no evidence at the motion hearing that counsel knew or should have known of the existence of Dr. Duncan-Hively or her willingness to testify. Counsel had not called an expert to testify in his prior cases of this nature. In addition, Dr. Duncan-Hively's testimony at the evidentiary hearing would not have provided Beck with a defense.

Dr. Duncan-Hively testified that allegations of abuse sometimes become the "weapon of choice" in "divorce situation[s]," but she admitted that this was not a divorce situation because Victim's mother and Beck were never married. And Victim's parents had been separated for years prior to the time the abuse occurred and for many years before it was disclosed. While Dr. Duncan-Hively testified the forensic interview was overly suggestive, she also acknowledged that children are less susceptible to suggestion the older they are, and Victim's forensic interview occurred when she was fifteen years of age. Further, the "insertions" or leading questions that Dr. Duncan-Hively faulted did not affect the overall reliability of the forensic interview. One question which Dr. Duncan-Hively faulted, the interviewer offered several numbers as possible answers for how many times Victim had been abused, followed an open question asking Victim to estimate how many times a certain act occurred, to which Victim answered that she didn't know before finally adopting one of the numbers the interviewer used. Another alleged "insertion" involved an open question by the interviewer asking Victim if she knew why she was there, to which Victim answered "sexual abuse" "by my father." Moreover, Dr. Duncan-Hively testified the interviewer, Randi Spruill, properly did not ask any "imaginary questions" during the interview; she accepted "no" for an answer when Victim answered questions with "no"; she did not offer reinforcements to Victim's testimony other than nodding; she did not

11

stereotype; she did not exhibit peer pressure.  Finally, while Dr. Duncan-Hively initially faulted interviewer Spruill for failing to obtain a narrative, she was later asked:

> Q:  And you indicated that there was no narrative in this whole interview?
>
> A:  No.  I think if that was what I said, I made an error.  What I was trying to say was that the goal with this age complainant is to obtain a narrative, which will then contribute to an understanding of what might not have happened.

The motion court found that Spruill's interview did allow Victim a chance to tell her story and did not use leading questions.  It did not find the follow-up questions to be leading. While Dr. Duncan-Hively testified that a narrative is generally considered the best way to get complete information she did not testify that the interview in this case failed to get complete information from Victim.

The motion court found Dr. Duncan-Hively's opinions did not offer Beck a viable defense and we agree.  Dr. Duncan-Hively's testimony would have at most raised an argument that the forensic interview was not properly conducted, but Victim testified at trial, and the jury was able to observe her testimony and demeanor.

Beck further argues extensively in his brief that Counsel was ineffective in failing to use Dr. Duncan-Hively to consult with him in preparation for trial and deposing the various State's witnesses.  However, this argument is not contained in the point relied on and is presented for the first time in the argument portion of the brief.  "A claim raised for the first time in the argument portion of the brief and not encompassed by the point relied on is not preserved for appeal." *State v. Wolf,* 600 S.W.3d 852, 858 n. 3 (Mo. App. W.D. 2020) (citing *Burns v. Taylor*, 589 S.W.3d 614, 622 n.5 (Mo. App. W.D. 2019)).

Point II is denied.

12

*Failure to Object to Witness Testimony; Point III*

Beck argues in Point III that the motion court erred in failing to find Counsel was ineffective for failing to object to the opinion testimony of Dr. Emily Killough, the doctor at Children's Mercy Hospital who examined Victim after she disclosed her abuse, based on the finding on direct appeal that the admission of this testimony was not plain error. We agree with Beck that "the denial of a plain error claim on direct appeal is not dispositive of the question whether counsel was ineffective in failing to preserve the issue as to which no plain error was found." *Ringo v. State*, 120 S.W.3d 743, 746 (Mo. banc 2003). As in *Ringo*, we conclude that the motion court did not clearly err in concluding that Counsel's conduct did not fall below the standard of a reasonably competent counsel in failing to object to Dr. Killough's testimony..

Dr. Killough testified that, upon examination of Victim, she found no physical signs of abuse but this was not unusual considering the abuse Victim disclosed had occurred years prior to the exam, and tissues such as the mouth and the anogenital area are composed of mucosal tissue, which heals quickly. Dr. Killough testified that the "overwhelming majority of children have normal examinations," and so most child sexual abuse is diagnosed based on the child's disclosure of abuse. Beck claims Counsel should have objected to the admission of this testimony.

The motion court noted that "[i]neffective assistance of counsel is rarely found in cases where Counsel has failed to object," *Cornelius v. State*, 351 S.W.3d 36, 44 (Mo. App. W.D. 2011), and that "[w]hile an expert witness should not be permitted to comment on the veracity of another witness, an expert is permitted to testify as to his or her opinion on

13

an ultimate issue in a criminal case as long [as] the opinion does not state that the defendant is guilty of a crime." *State v. Beck*, 557 S.W.3d 408, 422-23 (Mo. App. W.D. 2018) (quoting *State v. Wadlow*, 370 S.W.3d 315, 322 (Mo. App. S.D. 2012)). In this case, Counsel did not object to Dr. Killough's testimony because he believed Dr. Killough's testimony as to her diagnosis was not improper or objectionable. In fact, physicians can and do make medical diagnoses relying on a patient's subjective complaints. *See Kerns v. Midwest Conveyor,* 126 S.W.3d 445, 452 (Mo. App. W.D. 2004).

Because he did not believe the testimony to be objectionable, Counsel cross-examined Dr. Killough and made clear that no physical findings corroborated Victim's disclosures of abuse and that Dr. Killough's diagnosis was based solely on Victim's statements, which Counsel believed not to be credible. The motion court did not clearly err in concluding that Counsel's strategic decision to cross-examine Dr. Killough rather than to raise an objection that was likely to be overruled is a reasonable trial strategy. And "trial counsel is not ineffective for pursuing one reasonable trial strategy to the exclusion of another." *Davis*, 486 S.W.3d at 909 (citing *Barton v. State*, 432 S.W.3d 741, 749 (Mo. banc 2014)).

Point III is denied.

### *Failure to Impeach the Complaining Witness; Point IV*

Beck's Point IV argues that Counsel was ineffective for failing to sufficiently impeach Victim during cross-examination. Specifically, Beck alleges that Counsel should have further impeached Victim with her prior inconsistent statements. "The mere failure to impeach a witness does not entitle a movant to postconviction relief." *Fry v. State*, 244

14

S.W.3d 284, 287 (Mo. App. S.D. 2008). "The extent of cross-examination is usually a matter of trial strategy." *Hays*, 484 S.W.3d at 128.

At trial, Counsel did extensively impeach Victim[5] with prior inconsistent statements from her deposition and her forensic interview, regarding, among other things, whether Beck told her not to say anything about the abuse; her inability to estimate the number of times the abuse took place; and her inability to estimate the number of times specific acts of abuse occurred. However, "time is not of the essence in sex offense cases," and "children who are the victims of abuse may find it difficult to recall precisely the dates of the offenses against them months or even years after the offense has occurred." *Tucker v. State*, 468 S.W.3d 468, 473-74 (Mo. App. E.D. 2015) (internal quotation omitted). Also, with child victims of sexual abuse, there is a risk to excessive cross-examination, and Counsel may reasonably not want to alienate or offend the jury. *See id.* at 474-75.

At the motion hearing, Counsel testified that, after trying over 200 criminal jury trials, he generally stops cross-examination when he feels it needs to end, and he was at the point with Victim where he felt he had enough information to put in front of the jury to argue that Victim was lying. The motion court believed Counsel's decision as to the point at which to end cross-examination was strategic, and any further cross-examination with inconsistent statements would not establish "a reasonable probability of a different outcome." We agree.

Point IV is denied.

---

[5] The transcript of Victim's direct testimony is eighteen pages, whereas the transcript of the cross is twenty-nine pages.

15

*Failing to Object to Admission of Forensic Interview; Point V*

Beck's Point V is that Counsel was ineffective in stipulating to the admission of Victim's recorded forensic interview and in failing to object to "outcry testimony" from Victim's cousin, her sister, and the forensic interviewer. These witnesses testified that Victim had told them she had been sexually abused.[6]

At the motion hearing, Counsel testified that he agreed to admission of the recorded forensic interview at trial because Beck wanted the interview admitted and because both he and Beck believed that the interview evidenced Victim's many inconsistent statements. Counsel testified that it was a strategic decision, and such decisions are presumed to be reasonable. *Hoeber*, 488 S.W.3d at 659. We agree with the motion court's apparent finding that the strategic decision to stipulate to the admission of this testimony was reasonable and not ineffective.

Point V is denied.

### *Failure to Allow Beck to Review his Police Interview; Point VI*

Beck's Point VI is that Counsel was ineffective in failing to allow Beck to review the recording of his police interview prior to trial because if Beck had reviewed the

---

[6] Despite being one of ten points on appeal, this point alleges more than one error on the part of the Motion court, and, as such, it is multifarious and does not comply with Missouri Supreme Court Rule 84.04. *Fastnacht v. Ge*, 488 S.W.3d 178, 184 (Mo. App. W.D. 2016). A multifarious point preserves nothing for review and is therefore subject to dismissal. *Id.* Normally, we prefer to decide cases on the merits where we can readily discern and separate the independent claims of error in this point relied on, and we often, therefore, use our discretion to address the merits of each claim. *See Cityview Real Estate Servs., LLC v. K.C. Auto Panel, Inc.*, 576 S.W.3d 187, 191 (Mo. App. W.D. 2019). However, in this case, the objection in the point relied on to the "outcry testimony" of Victim's cousin, her sister, and the forensic interviewer is not separately addressed in the argument section of the appellate brief but is merely mentioned in passing as "repetition of false information." "It is not within the appellate court's province to speculate about and then decide arguments that are not asserted or that are merely asserted, but not developed." *Firestone v. VanHolt*, 186 S.W.3d 319, 324 (Mo. App. W.D. 2005). Because the lack of objection to the admission of the "outcry testimony" is not supported by argument, it is deemed abandoned. *Id.*

16

video he could have pointed out to Counsel during trial various inconsistencies in the detective's trial testimony. Counsel testified that they were unable to view the interview before trial because their equipment could not play it, but that he had reviewed the "statement by the detectives" prior to trial. Beck contends that had he personally been able to review the interview, he would have been able to draw Counsel's attention to an inconsistency between the Detective's testimony at trial and what occurred with the interview.

Beck's underdeveloped argument on this point in his brief does not set forth a single discrepancy between what occurred as part of his interview with the Detective and the Detective's trial testimony, not even the one the motion court addressed below.[7] Beck's brief merely vaguely implies that the Detective's testimony is at odds with Beck's memory of the interview, which the brief acknowledges might not be clear due to the "high-stress situation." This is simply insufficient to establish prejudice under *Strickland*, 466 U.S. at 687.

Point VI is denied.

### *Jury Selection Issues; Point VII*

Beck's Point VII on appeal is that Counsel was ineffective for failing to adequately question Juror, who responded in the affirmative to the prosecutor's question about whether any prospective juror had been the victim of any child physical or sexual abuse. Juror responded that she had been abused when she was about ten to thirteen years old. When

---

[7] Post-Conviction Counsel also appears to have been unable to resolve the problem with the video of the interview.

17

asked whether her situation had been handled outside of court, she answered, "It didn't go that far," and when asked whether there was anything about her experience that would prevent her from being fair and impartial in the case, she responded, "No, I don't think so."

"Whether a prospective juror is qualified is to be determined from the context of the entire voir dire examination, not from a single response." *Pearson v. State*, 280 S.W.3d 640, 646 (Mo. App. W.D. 2009). "A possibility of prejudice is not sufficient to disqualify a juror: 'It must clearly appear from the evidence that the challenged venireperson was in fact prejudiced.'" *Id.* (quoting *State v. Walton*, 796 S.W.2d 374, 377 (Mo. banc 1990)). "[I]f the prospective juror states he or she can set aside a stated concern, be fair and impartial, and follow the court's instructions, the prospective juror has been rehabilitated and is qualified to sit on the jury." *Id.* (internal quotation omitted).

In this case, although Juror answered that she had been the victim of childhood abuse, Counsel testified that he felt Juror could be fair and if he had felt he had needed to follow up further with her, he would have. Co-Counsel, who helped with jury selection, testified that his notes reflected Juror's answers and concluded that she "would present no problem." Beck points to no other responses by Juror that he alleges could possibly have been problematic.

Beck argues Juror's answer, "No, I don't think so," in response to whether her experience would prevent her from being fair and impartial, was inadequate. "If a venireperson unequivocally indicates an ability to evaluate the evidence fairly and impartially, trial counsel is not ineffective for failing to seek removal." *Id.* at 646. Although Juror used the phrase "I don't think so," the response, as an identical response in

18

*State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981), was "not equivocal in its context; it is common vernacular to express a negative." *See also State v. Pride*, 567 S.W.2d 426, 432-33 (Mo. App. 1978). Furthermore, the motion court in this case was the same as the trial court, who also had an opportunity to observe the *voir dire* at trial. "[S]pecial deference is given when the [Motion] judge and the [trial and sentencing] judge are the same." *Dawson v. State*, 611 S.W.3d 761, 767 (Mo. App. W.D. 2020). And "[a] motion court's findings are presumptively correct. In this case, they carry special weight since the motion court was also the trial court, and thus was best positioned to determine" if the voir dire questioning of potential jurors was constitutionally inadequate. *Joos v. State*, 277 S.W.3d 802, 805-06 (Mo. App. S.D. 2009) (internal citation omitted). The motion court in this case found no prejudice, and thus determined Beck did not establish that Counsel was ineffective on this ground. We do not find this conclusion clearly erroneous.

Point VII is denied.

### *Failure to ask for mistrial or curative instruction; Point VIII*

Beck's Point VIII is that counsel was ineffective for failing to seek a mistrial or curative instruction after another venireperson ("Venireperson"), who was not ultimately part of the jury, made a comment about a family member who "got away with" child abuse.[8] Beck contends that Counsel should either have requested a curative instruction or a mistrial

---

[8] While not part of the argument in this case, it should be noted that Venireperson had already made multiple responses that made clear he would not be an appropriate juror for this case including that he would not follow the judge's instructions and that he could not be fair and impartial in this case. At a conference at the bench regarding Venireperson the trial court stated, "I think it's pretty clear now, there's a couple of these people that we don't have to keep asking them and asking them." Indicating Venireperson had established he should be excused from this jury for cause and in order to avoid further statements that might impact the jury, counsel did not need to further question Venireperson.

following the comment. Co-Counsel testified at the motion hearing that a discussion was had after Venireperson's comment about whether to request relief, and Co-Counsel stated, "I think you're only going to make it worse if you pick at it at this point." Explaining, Co-Counsel testified:

> Continuing to focus on that with that particular venireperson, in light of the comments that he had made that he wouldn't follow the Court's instructions, and then I do find a second reference several pages later where I made the notes: The first time he got away with it, the second time he was guilty, with a family member. And he had apparently uttered the word "No." I put that in quotation marks with an exclamation point. I felt that that person was a problem enough without continuing to hammer away at it and pick at it because I felt that he was a loose cannon.

Clearly, this was a matter that Counsel and Co-Counsel focused on, discussed, and handled the way they did as a matter of trial strategy. Venireperson did not serve on the jury, and there is nothing in the record to show his responses to questions caused any member of the jury to be biased or to fail to follow the law. Beck did not convince the motion court that the strategy was unreasonable, and we do not find the motion court's determination that it was a matter of reasonable trial strategy to be clearly erroneous. Beck does not establish that his Counsel or Co-Counsel was ineffective for failing to request a curative instruction or a mistrial.

Point VIII is denied.

## Conclusion

The judgment of the motion court is affirmed.

_____
Gary D. Witt, Judge

All concur

20